KLIND, RESPONDENT, v. VALLEY COUNTY BANK OF HINSDALE, APPELLANT.

(No. 5,362.)

(Submitted November 22, 1923. Decided January 12, 1924.)

[222 Pac. 439.]

*Conversion — Livestock — Measure of Damages — Value — Evidence—Exemplary Damages—When Recoverable.*

Conversion—Measure of Damages—Election.
  1.  In an action for conversion plaintiff may elect to claim damages for the value of the chattel at the time of the alleged conversion, or its highest market value at any time between the conversion and the verdict, without interest (Rev. Codes 1921, sec. 8689), but he may not claim both.
Livestock—Brands—Ownership of Animals.
  2.  *Prima facie* one is the owner of cattle bearing his recorded brand.
Conversion—Evidence of Value—Owner of Property may Make Estimate.
  3.  *Prima facie* proof of ownership of personal property alleged to have been converted is sufficient to qualify the claimant to make an estimate of its reasonable value.
Same—Value of Livestock—Evidence Admissible.
  4.  Reasonable experience in raising, dealing in and handling livestock is all the law requires in order to qualify one to give an estimate of their reasonable value.
Same—Exemplary Damages—Malice of Agent Imputable to Principal.
  5.  Evidence in an action against a bank for the conversion of cattle claimed by defendant to have been taken under a chattel mortgage

---

  2.  Brand as evidence of *prima facie* ownership of cattle, see notes in 12 Ann. Cas. 414; 18 Ann. Cas. 544; Ann. Cas. 1913E, 133; 11 L. R. A. (n. s.) 87.
  5.  Punitive or exemplary damages for unlawful seizure of mortgaged chattels by mortgagee assuming to act under mortgage, see note in L. R. A. 1915E, 199.

[69 Mont. 386.]

executed by a third person, *held* sufficient to show malice on the part of defendant's agents in taking the cattle, which malice was imputable to defendant, and therefore sufficient to warrant the award of exemplary damages.

Same—Exemplary Damages—When Recoverable.
  6.   Exemplary damages may be recovered where the wrongful act complained of is characterized by such circumstances of aggravation as willfulness, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence or gross fraud on the part of defendant.

Same—Exemplary Damages—Malice may be Proved, How.
  7.   Malice, as a basis for exemplary damages, may be proved directly, or by legitimate inferences to be drawn from other facts and circumstances in evidence, the motive of defendant being a most material subject of inquiry.

*Appeal from District Court, Valley County; C. D. Borton, Judge.*

ACTION by Waino Klind against the Valley County Bank of Hinsdale. Judgment for plaintiff and defendant appeals. Affirmed.

*Messrs. Norris, Hurd, Rhoades & Hallett,* for Appellant, submitted a brief; *Mr. W. B. Rhoades* argued the cause orally.

*Mr. E. N. Hill* and *Messrs. Hurly, Kline & Slattery,* for Respondent, submitted a brief; *Mr. John M. Kline* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action in conversion. The plaintiff in his complaint alleges that he is the owner of twenty-two head of cattle particularly described therein and that on or about the seventeenth day of October, 1921, the defendant, well knowing that the plaintiff was the owner of such cattle and entitled to the possession thereof, willfully and maliciously intending to deprive the plaintiff of the cattle, took the same and converted them to its own use, to plaintiff's damage in the sum of $965, In addition to compensatory damages, $500 was asked as exemplary damages. By its amended answer the defendant denied generally the allegations of the plaintiff's complaint, and affirmatively alleged that the cattle in question were

covered by a chattel mortgage executed to it by one Jack Klind on December 20, 1920, as security for the payment of the latter's indebtedness, and that on the date of the alleged conversion, the mortgage having been unsatisfied, and Jack Klind being in default under the provisions of the mortgage, the defendant took possession of the cattle described in plaintiff's complaint, save and except a spotted-faced heifer and a red cow with calf; further, that the cattle were taken from the possession of Jack Klind, and not from the plaintiff, and that any interest which the plaintiff may have in the cattle is subsequent in time and inferior in right to the lien of its mortgage. Issue was joined by plaintiff's reply. The cause was tried to a jury, which rendered its verdict in plaintiff's favor for $965, with interest at eight per cent from the date of the conversion and exemplary damages in the sum of $500. Judgment was entered in accordance with the verdict, it being adjudged therein that the plaintiff recover from the defendant "the sum of $965, with interest thereon at the rate of eight per cent per annum from and since the seventeenth day of October, 1921, such interest amounting at the date of the return and entry of said verdict to the sum of $104.43, making an aggregate of $1,069.43, principal and interest, together with the further sum of $500 as exemplary damages, making a total judgment in the sum of $1,569.43," together with plaintiff's costs, taxed and allowed at the sum of $352.50. The defendant moved for a new trial, which was by the court denied April 24, 1923, "unless the plaintiff shall consent, within 10 days from this date to a remission of $30 from the amount found by the jury as plaintiff's actual damages." On the last-mentioned date the plaintiff filed his consent in writing to a remission of the sum of $30 of the amount of damages found by the jury pursuant to the court's order. The appeal is from the judgment as modified.

The errors assigned raise only the question of the sufficiency of the evidence as to plaintiff's actual damages, and to justify the award of exemplary damages.

1. The elements of proof required to sustain an action of conversion are: (1) Plaintiff's ownership and right of posses-
[1]  sion of the chattels involved; (2) conversion thereof by the defendant; and (3) resulting damages. The rule of damages in case of conversion is fixed by our Code as follows: "The detriment caused by the wrongful conversion of personal property is presumed to be: (1) The value of the property at the time of its conversion, with interest from that time; or (2) where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party." (Sec. 8689, Rev. Codes 1921.)

In this case the plaintiff elected to claim damages for the value of the cattle at the time of the alleged conversion. This was proper, for he would not be permitted to rely upon both measures of damages authorized by the statute. (*Thornton-Thomas Co.* v. *Bretherton,* 32 Mont. 80, 80 Pac. 10.)

In this case we think the proof amply sustains the conversion of the cattle as alleged. It appears that the plaintiff is a brother of Jack Klind and a son of Callie Klind. In the fall of 1921 the plaintiff rented Jack Klind's ranch, and moved there from Callie Kline's ranch, the plaintiff taking with him his cattle. He had a duly recorded brand first registered by him April 15, 1918, and reregistered October 8, 1921, such brand being M D with a bar underneath it (**M D**), on the right ribs. Of the cattle in question twenty head were branded with plaintiff's brand, one cow was branded with his brother Charles' brand, W lazy A quarter circle underneath (W≼), and one calf was unbranded. A calf was born to the cow branded with Charles Klind's brand after the alleged conversion. Jack Klind's cattle brand is T lazy 4 (T⤨), on the right hip, and of the number of cattle so claimed by the plaintiff only one, a red cow, bore the Jack Klind brand, which was vented by crossing it diagonally with a bar, and this animal also carried the plaintiff's brand. She had a calf and it bore plaintiff's brand alone. The cow which bore his brother

Charles' brand the plaintiff purchased in 1918, as did he also the cow bearing his brother Jack's brand. The plaintiff testified that he traded a steer for the cow which he bought from his brother Jack in the year 1918, and that the defendant got the money realized upon sale of the steer.

Jack Klind being indebted to the defendant, and having executed to it a chattel mortgage covering a number of cattle as security, upon default in the payment of his indebtedness, the cashier of the defendant bank, S. M. West, on October 17, 1921, went to the Jack Klind ranch in company with Charles Hall, sheriff of Valley county, and three range riders for the purpose of taking possession of the mortgaged cattle. The riders rounded up a considerable number of cattle, many of which bore the Jack Klind brand. The plaintiff then made claim to Mr. West and to the sheriff of the cattle involved herein, and protested against their being taken away. There were three of Jack Klind's cows bearing his brand, with calves by their sides, which calves were branded with plaintiff's brand. The plaintiff said he had bought these calves from Jack Klind in the spring with the consent of the defendant, and the plaintiff then offered to pay for them. Mr. West refused to let them go, saying, in effect, that was the deal all right, but "I think I will back out."

Plaintiff's cattle, together with the cattle bearing Jack Klind's brand, about forty-one head in all, were driven away, and the following day the plaintiff executed and served on the sheriff his duly verified third party claim for the cattle involved, plus three head of calves, twenty-five in all. Later, on November 12, 1921, pursuant to published notice, all of the cattle so taken by the sheriff were sold on summary foreclosure in accordance with the terms of the mortgage. When the cattle were offered for sale the plaintiff climbed upon the corral fence whereby they were inclosed and held for inspection, and announced to all prospective buyers assembled that he claimed and owned twenty-three head of the cattle. He testified: "I told them, so everybody could hear. They didn't pay any

attention to that claim, and went ahead and sold them. They sold the bunch as a whole, not one at a time. I claimed twenty-three head, because there was one calf born after they left my place, about two days old. The cow branded W lazy A quarter circle had a calf since she left my place.'' All of the cattle were sold to S. M. West, representing the defendant bank, the only bidder, for $700. The defendant's mortgage, under which it laid claim to the cattle, was not introduced in evidence, and neither was the note for which it was given as collateral security. The mortgage was offered in defense, and a copy thereof appears in the record. It is found from a reference thereto that it would have been of no avail to the defendant, had it been admitted, for it describes ''twenty-nine head of cattle, all ages and sexes, branded with Jack Klind's brand, T⊹ on the right hip.''

*Prima facie* the plaintiff was the owner of the cattle involved [2] herein bearing his recorded brand (sec. 3304, Rev. Codes 1921), and all evidence introduced by him in support of his ownership and title to the several animals was cumulative, save as respects the cow branded W lazy A quarter circle and the one unbranded calf. The only proof offered by the defendant in any way tending to dispute the plaintiff's claim of ownership to the cattle was elicited from the witness West, cashier of the defendant. He testified that some time prior to October 17, 1921, he had a conversation with Jack Klind, at which Waino Klind was present, relative to the ownership of certain cattle belonging to the Klinds. The conversation took place near Callie Klind's place. Concerning such conversation he says: ''Callie Klind, Jack Klind, Waino Klind and I think both Charley and Dave, and at least one of the girls, were there. There were present at that time cattle which were represented to me as descendants of the so-called Hoke cows. Q. What conversation did you have with these Klinds relative to the ownership and to the past title of these Hoke cattle on that occasion? A. I asked them if these cattle with this brand, W lazy A quarter circle, were not Dave Klind's cattle, and they went into

detail and explained they were Charley Klind's cattle, and
had come from the Hoke cattle, and that Charley Klind had
sold these cattle to Jack. I was particularly interested. The
members of the Klind family and I inspected these and other
Klind cattle at that time. As to the ownership of each brand,
the T⅃ cattle were owned by Jack, the S bar K cattle were
Jack's, the W. lazy A quarter circle were Jack's, and the W
triangle bar were Callie Klind's, all those four brands there.
At that time Waino Klind did not claim any ownership in the
Jesse Hoke cattle or their descendants. Q. Did he in any way
dispute the ownership of Jack Klind to the Hoke cattle?
A. No; he didn't. At that time I informed Waino Klind and
the other Klinds why I was asking about the ownership of those
cattle and those particular brands. I told them to take a
mortgage on them; that I wished to take Jack Klind's and also
Callie Klind's mortgage on them. At that time I listed these
cattle, and took a list of all the brands on these cattle we were
discussing. Q. And in that list did you have listed the Jesse
Hoke cattle, with the Jesse Hoke brand thereon, that were
there before you? A. I did; I made the list. Subsequent
thereto Jack executed a mortgage on the cattle as were listed;
that mortgage is now on file in the clerk and recorder's office
here. The mortgage was dated the 25th, but not signed until
. later; the 25th of June, 1919.''

This proof was not sufficient to even overcome the presump-
tion of plaintiff's ownership of the cattle bearing his brand,
but left a conflict in the testimony as to the ownership of the
W lazy A quarter circle cow and the unbranded calf, which
was resolved by the jury in plaintiff's favor.

The appellant assigns as error, and argues, that the proof
is insufficient with respect to the value of the animals alleged
to have been converted, upon which to sustain a verdict of
either actual or exemplary damages, and that therefore it is
apparent that the verdict was given under the influence of
passion and prejudice.

In proof of the value of the animals converted, the plaintiff testified, based upon his personal knowledge of the particular cattle and eight years' experience in raising and handling cattle in the immediate vicinity, that the "whole bunch" of cattle were worth from $835 to $950; and he thereupon gave specific estimate of the animals.

Frank Schultz, for the plaintiff, testified: "I have had around twenty years' experience handling cattle up there, and during that time I have bought and sold some. At that time I did not have any cattle of my own, but I had some before that. I had a few head now and then; buy cattle and sell them again; running cattle with my father and brother; running those. This extended over something like twenty years. I believe I would know the market value of cattle in that vicinity on October 17, 1921, the time these cattle were taken. On the day the cattle were taken—the bunch of M D bar cattle that I saw at that time would value at approximately $950; that is what they would be worth to me if I had them. If I were selling them to someone, that is what I would want. I believe it would cost me that to buy similar cattle at that time. If I were buying these cattle per head, keeping in mind the condition of the cattle with the calves thrown in and all, I would figure them at around $65 a round, calves thrown in. I have seen cattle in 1921 just like this sell for $65 per round. I have seen cattle sell for more than that. That happened at different places I have been around."

John Schultz, a witness for the plaintiff, testified that he is a stockman and farmer, and has raised stock in the vicinity to the extent of fifty or seventy-five head during the past twenty years. He described the animals specifically, from an inventory which he had made of them the day of the sale, and estimated the value of the bunch at between $900 and $1,050.

All this testimony of these three witnesses as to value was introduced without objection on the part of the defendant or question as to their qualification. On cross-examination of each of them, it appeared that none of them were familiar

with any sales of cattle in the immediate vicinity in the fall of 1921, and therefore it is argued that such evidence is of no merit whatsoever on the question of value.

Defendant's contention relative to such character of evidence is not supported by the correct rule applicable. As to the owner's version of the value of the property converted and the sufficiency of his evidence in that respect, Professor Wigmore, in his work on Evidence, lays down the correct rule as follows: "The general test, that *anyone familiar*, with the values in question may testify, is liberally applied, and with few attempts to lay down detailed minor tests. The owner of an article, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and the courts have usually made no objection to this policy." (Wigmore on Evidence, 2d ed., sec. 716.)

The correct result was reached by this court in *Roy* v. *Clark,* (not officially reported), 215 Pac. 232, but this court was in error therein in indicating that, in an action of conversion, the owner of personal property, by reason of such ownership alone, is not qualified to give an estimate of its value. We are now **[3]** satisfied that *prima facie* proof of ownership of personal property alleged to have been converted is all that is required to qualify the claimant to make an estimate of its reasonable value, and so declare the rule.

Professor Jones, in his work on Evidence, by Horwitz, states the rule governing the testimony introduced in this case by the witnesses Frank Schultz and John Schultz as follows: "When a market value has not been created, the opinions of farmers who have dealt in the kind of animals which are the subject matter of inquiry is relevant as to value." (Sec. 169.)

Reasonable experience in raising, dealing in and handling **[4]** like animals is all the law requires in order to qualify one to give an estimate of the reasonable value of livestock. (*Holland* v. *Huston,* 20 Mont. 84, 49 Pac. 390; *Emerson* v.

*Bigler,* 21 Mont. 200, 53 Pac. 621; *Porter* v. *Hawkins,* 27 Mont. 486, 71 Pac. 664; *Matoole* v. *Sullivan,* 55 Mont. 363, 177 Pac. 254; *Anderson* v. *Chicago, B. & Q. Ry. Co.,* 84 Neb. 311, 133 Am. St. Rep. 626, 120 N. W. 1114; *State Bank of Williams* v. *Gish,* 167 Iowa, 526, 149 N. W. 600.)   And generally, with reference to the sufficiency of the evidence of the two last named witnesses, we think the rule is well stated by Justice Wells in the case of *Whitney* v. *Thacher,* 117. Mass. 523, subscribed to in Sedgwick on Damages, ninth edition, section 1294, as follows: ''It is not necessary, in order to qualify one to give an opinion as to values, that his information should be of such a direct character as would make it competent in itself as primary evidence.   It is the experience which he acquires in the ordinary conduct of affairs, and from means of information such as are usually relied on by men engaged in business, for the conduct of that business, that qualifies him to testify.''

It is true that the estimate of the value of these cattle was rebutted by the defendant, but this simply raised a conflict in the testimony, and left the subject of the value a proper matter for determination by the jury within the limits of the evidence introduced.   The jury were apparently satisfied with the plaintiff's estimate of the value of the cattle, and it cannot be said that there was not ample evidence to justify the verdict as to the amount of actual damages.

2. As to the evidence justifying the award of exemplary [5]   damages, because of the malicious taking of the property, there is ample proof to support the verdict.   With the cattle there were several horses rounded up bearing Jack Klind's brand, and a particular horse with the rest claimed by the plaintiff.   As to the latter horse the plaintiff laid claim thereto, and in this connection testified: ''I tried to cut my cattle out from the rest, but Charley Hall and Mr. West would not let me.   After I told Mr. West these were mine, and what my brand was, and after I tried to cut them out, he said to the cowboys: ' * * * Take them all.'   When I stopped cut-

[69 Mont. 386.]

ting out my cattle, David and I tried to stop them, and Charley Hall said: 'We will take them all.' Some horses were brought up at that time and were put in the straw corral. Q. Did you make any claim to any of those horses? A. Yes; I tried to catch one of the horses with a rope, and I made a claim to Mr. West for that horse. Mr. West said he would take him, and I told him that was my horse. He said: 'I don't give a damn who owns him; we take him anyway.'"

Frank Schultz testified: "When I was there at that time, the horses were in the first corral, in the straw corral. They finally went cutting the horses; they cut the T⦁ bar horses out, the Jack Klind horses from Waino's bunch, into a separate part of corral. In this bunch was a horse Waino claimed to own, and a while before he told me he wanted me to break this horse, K lazy K on the right shoulder—Weller horse and considered an outlaw. I went over that day to get him to break, they cut him out with Jack's horses, and put him in the corral with Jack's horses. Waino went in the corral to get the horse, and said it was his, and he did not want West to take this horse. West says: 'We don't give a damn who he belongs to; we are going to take him.' After that Waino made claim for some cattle. I believe Dave and Waino started cutting back the M. D. bar cattle, and during the mix-up, while the Ottenstror boys, working for the bank and sheriff, were trying to take their bunch, and the Klind boys were trying to cut their cattle back, the sheriff says, 'Hold on here! We will take those cattle,' and they took them. After that Mr. West went over to my brother's place with my brother and me to dinner, and we talked off and on all the way back about those cattle. I told Mr. West about knowing some of those animals, and he said undoubtedly there were some of those animals in there that belonged to Waino Klind all right, but he was going to take them along and make an example out of the Finns. I was at the sale at the McGregor corral; there were lots of fellows there; I could not tell all of them. There was a man named Bracken there; he went over with us boys. I heard Bracken

talking with West about buying those cattle.  Bracken wanted
to buy some of the Jack Klind cattle, and West wanted to sell
him the whole bunch straight, M. D. bar, and Bracken says,
'No; I don't want to buy any lawsuit; I want to buy Jack
Klind's cattle.'  West says, 'You can buy the whole bunch; I
will stand back of you'; and he said, 'No.' "

John Schultz testifed: "Jack Klind stepped up [to West],
and said he had sold those calves and colts to Waino; he said,
'You understand the agreement I had with you last spring;
Waino wanted the colts and calves, and I told you he wanted
to buy them, and you told me it would be all right to sell
them.'  Mr. West said, 'Well, I think I will back out on that
deal; there hasn't been anything paid down on this stuff.'  I
knew a man named Bracken at that sale.  I heard him speak-
ing to Mr. West at the sale, and he said he came over to buy
some cattle, but he didn't want to buy the cattle that way;
he said there was a dispute about those cattle.  Mr. West said,
if he wanted to buy any of those cattle, why didn't he go
ahead and buy them, or he could buy them yet.  He said, 'No;
I don't want to buy any lawsuit.'  The boy got on the corral
and claimed those cattle, and no one denied him.  They sold
those cattle in a bunch.  After they got through gathering
the cattle and getting them away from there, Mr. Hall and
Mr. West and myself and Frank, my brother, went over to
my place and got us some dinner about 2 o'clock.  About that
time Frank said to Mr. West, 'I am afraid you are going to
get into trouble over those cattle'; and Mr. West said, 'I don't
know.'  Frank said, 'There is one in there he got from Lute,
and I know that one steer in there'; and he said, 'You will
probably have a lawsuit on your hands'; and West said, 'I
will take a chance on it; I will take them anyway.' "

In defense, S. M. West says that he acted for the defendant
bank in taking the mortgage security from Jack Klind on his
cattle, and at the sheriff's sale in making purchase thereof.
He testified: "The defendant took charge of those cattle on
the 17th of October, 1921, on Jack Klind's premises.  At that

time I was there, Waino was there, and I believe Charley Klind and Dave, two of the Schultzes, Ben Terhark, Frank Ottenstror, John Ottenstror, Sheriff Hall, and John Frisch. Those are the people there when the cattle were seized; John Frisch, Earl Weger, Donald Mansfield, Enoc Carey, and I believe that is all now. The sheriff took charge of the cattle at that time, and the two Ottonstrors and Ben Terhark took them there; the sheriff was acting for me, the Valley County Bank. * * * I was present at the McGregor ranch when these cattle were sold. Deputy Sheriff Hess had charge of the selling. Quite a crowd was present at that time; the Klinds were there, I was there, Schultzes were there, and a number of neighbors; I would say there were probably twenty or twenty-five there. On the day of the seizure Waino Klind said these cattle were his, and I said, if they were, he would have a chance to prove it. He offered to pay for the calves, and I refused that."

Charles Hall testified: "I was sheriff of Valley county in 1921 and 1922, and was acting as such sheriff on the seventeenth day of October, 1921. As such sheriff, in the foreclosing of a mortgage on the Jack Klind cattle south of Hinsdale, at the request of Mr. West, or of the Valley County Bank of Hinsdale, we took possession of the stock and sold them. I was there when the stock were possessed, and took charge of same. At that time Mr. West made arrangements with some other parties to take care of the stock, and I delivered the stock to those other parties. At the request of Mr. West, under the chattel mortgage, this bunch of stock was afterwards sold by me, or some of my deputies."

If this evidence shows malice warranting the award of exemplary damages, as we think it does, the agent's malice is imputable to the defendant bank. (*Grorud* v. *Lossl*, 48 Mont. 274, 136 Pac. 1069.)

In the case of *Luther* v. *Lee*, 62 Mont. 174, 204 Pac. 365, this court correctly laid down the rule respecting the award of [6] exemplary damages, as follows: "To warrant the re-

covery of such damages the act complained of must not only be unlawful, but must also partake somewhat of a criminal or wanton nature. And it is an almost universally recognized rule that such damages may be recovered in cases, and only in such cases, where the wrongful act complained of is characterized by some such circumstances of aggravation as willfulness, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence, or gross fraud on the part of the defendant. (8 R. C. L. 585, 586.)''

The complaint in this action predicates the right of recovery of punitive damages on the malicious taking of the cattle by the defendant, and we think the evidence sufficiently indicates a wish on the part of the defendant to vex, annoy or injure the plaintiff under the Code definition of the words ''malice'' and ''maliciously.'' (Sec. 10713, Rev. Codes 1921.) Accordingly the award made by the jury was warranted. (See *Moelleur* v. *Moelleur*, 55 Mont. 30, 173 Pac. 419; *Jones* v. *Shannon*, 55 Mont. 225, 175 Pac. 882.)

''Malice, as a basis for exemplary damages, may be proved [7] directly or indirectly; that is to say, by direct evidence of the evil motive and intent, or by legitimate inferences to be drawn from other facts and circumstances in evidence. Where punitive damages are sought, the motives of the defendant become a most material subject of inquiry.'' (8 Cal. Jur., sec. 141, p. 908.)

In the instant case the defendant evinced a wanton and malicious disregard of plaintiff's rights.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and STARK concur.