DAVID DUTTON ET AL., PLAINTIFFS AND RESPONDENTS, *v.* ROCKY MOUNTAIN PHOSPHATES, DEFENDANT AND APPELLANT. EDWARD MOLLENBERG ET UX., PLAINTIFFS AND RESPONDENTS, *v.* ROCKY MOUNTAIN PHOSPHATES, DEFENDANT AND APPELLANT.

Nos. 11205, 11214.
Submitted November 27, 1967. Decided March 20, 1968.
Rehearing Denied April 9, 1968.
438 P.2d 674.

Wade Dahood, Anaconda, H. A. Bolinger, Jr., Bozeman, Malcolm MacCalman (argued) Deer Lodge, for appellant.

Boone & Karlberg, Missoula, Drysdale & Sabo, Bozeman, Karl R. Karlberg (argued) Missoula, Alfred F. Dougherty (argued) Helena, for respondents.

DISTRICT JUDGE PAUL G. HATFIELD delivered the Opinion of the Court.

These appeals, No. 11205 with regard to the damage feature, and No. 11214 with regard to the injunction feature, were appealed separately with separate briefs and partially separate transcripts. This opinion will determine them together as the facts apply to both appeals.

In the Court below, No. 16469, David Dutton, et al. v. Rocky Mountain Phosphates, Inc., was filed in the District Court of Powell County in February 1964. Also, cause No. 16470 was filed by Edward Mollenberg and his wife against the same defendant in Powell County. In both cases the plaintiffs individually asked for injunctive relief to permanently restrain the operation of defendant's manufacturing plant at Garrison, Montana. Each plaintiff also asks for compensatory damages

against the defendant and all except Mollenberg ask for punitive damages.

The cases were consolidated for trial and the place of trial was transferred to Gallatin County before the Honorable W. W. Lessley, Judge of the Eighteenth Judicial District. As there are several plaintiffs and more than one cause consolidated for trial, the parties will be referred to by name where necessary.

The trial of the injunctive feature was begun on May 5, 1965, and after extensive testimony and exhibits an order was entered denying the injunction pendente lite, but directing that the defendant at its own expense initiate a testing program under the independent direction of the Industrial Development of Engineering Research at Montana State University, Bozeman, Montana; that the testing agency make reports to the court and to the attorneys of record; and that the court retain jurisdiction of the question of injunctive relief until further order of the court.

The jury was begun on March 21, 1966, the jury trying the damage aspect and the court trying the injunctive feature. The jury awarded compensatory damages to each plaintiff which in the aggregate totalled $113,283.80 and will be detailed below. The jury also awarded $10,000 punitive damages collectively to all plaintiffs except the Mollenbergs. Judge Lessley denied the permanent injunction. The defendant moved for a new trial and for judgment, notwithstanding the verdict, both of which were denied by Judge Lessley. The defendant appealed from the jury verdict and judgment and the plaintiffs appealed from the Findings of Fact, Conclusions of Law and Judgment denying the injunction.

The defendant is a Montana corporation formed in 1959 for the purpose of manufacturing defluorinated phosphate, a mineral animal feed supplement.

The defendant's President, Bryce Rhodes, is admittedly an expert in the United States on the processing or defluorination

of phosphate rock and also expert with relation to the emission of fluorine from the process and its subsequent effect on livestock and growing crops. Bryce Rhodes and the plant manager, Adrian Mather, have degrees in chemistry and have extensive experience with fluorine and defluorination of phosphate rock.

The plaintiffs are ranchers owning land and cattle within a radius of 15 miles of Garrison, Montana.

Garrison, Montana, is a rural community situated at the junction of the Little Blackfoot and Clark Fork Rivers in Powell County, Montana. The lands within an approximate 15 miles radius of the community are agricultural in character and best suited for the production of grass and hay. These lands have for many years been devoted to the raising of cattle and other livestock.

The manufacturing of defluorinated phosphate consists basically of treating finely ground phosphate rock by either of several methods to release most of the fluorine in the rock so that the finished product will have not more than 18/100 of one percent of fluorine content. The original rock at the beginning of the process herein involved had fluorine content ranging from 3.3 percent to 4.17 percent depending on its source. Unless captured, the fluorine compounds called "fluorides" are emitted into the atmosphere.

Fluorine is a very active chemical agent which never exists free and independent in nature. It is a colorless, odorless and tasteless gas. It is present in all vegetation and in all tissue. Fluorine, when ingested by animals in excessive amounts, can cause varying degrees of injury. Also, fluorine can cause damage to coniferous trees. This damage is called fluorosis.

Fluorine toxicosis is similar in all species of cattle. In involves the teeth, bones and the well-being of the animals. The degree of toxicosis depends upon the amount and period of ingestion of fluorine and also upon the solubility of the fluoride compounds ingested. Excessive fluorine is retained

by the animal and builds up a toxic condition over the period of ingestion. The danger level of fluorine in forage for safe ingestion by livestock is approximately 50 parts per million and perhaps as low as 30 parts per million, depending on the fluoride compound and the age and use of cattle; for instance, dairy cattle ingest more feed than beef cattle.

Young cattle are damaged by excessive fluorine ingestion during the time they are forming permanent teeth and immediately after the permanent teeth erupt. Excessive fluorine ingestion also stimulates bone growth and results in hypostatic material forming on the pereostio or straight portion of the bone. It also causes mild ossification of the tendons and the periosticular structure. This results in lameness in the animal. In severe cases the afflicted animal may refuse to stand to avoid pain. Secondary effects are similar to symptoms of malnutrition and starvation. In coniferous trees, especially Douglas Fir and Ponderosa Pine, severe cases result in shedding of needles and death of the tree.

The defendant started operation in April 1960 by leasing the Domestic Manganese Company plant near Butte, Montana. There the phosphate rock produced near Garrison was treated with phosphoric acid, sulphuric acid and water. This mixture released approximately 50 percent of the fluorides from the rock by chemical reaction. The mixture then was heated in a gas fired rotary kiln to 2,400 degree which roasting released practically all the fluoride compounds remaining in the rock.

In 1962 the officers of the defendant corporation decided to move to Garrison, Montana. A surplus plant at Henderson, Nevada, was purchased. In April 1962 the Garrison plant site of 53 acres of land was purchased from plaintiff Mollenberg for $15,000. Construction was begun on the Garrison plant.

In 1963 a nuisance action was started at Butte which resulted in Judge Fall issuing an injunction restraining operation. This court held the injunction improperly issued and

injunction was suspended until July 1, 1963. Supreme Court File No. 10505.

The company moved to Garrison and began production on August 2, 1963, using 400 tons of materials which had been partially treated in Butte by mixing with acids and water which released about 50 percent of the fluoride compounds. When the operations began on August 2, 1963, at Garrison, the plant was designed as the former plant at Butte had been. In August 1963, scrubbing equipment to remove or scrub out the fluoride compounds released by the roasting process had been designed but were not operating. They did not operate until the middle of September 1963. Mixing operations began in the so-called den on August 28, 1963. The scrubber for the mixing den did not operate until October 5, 1963.

In August 1963, with no scrubbers operating, the plant emitted 12,600 pounds of fluorides.

Within a few days after operations were begun at Garrison in August 1963, complaints of nuisance were received by Mr. Rhodes and a public meeting with the ranchers was held. The first nuisance suit at Garrison against the defendant was filed October 10, 1963. Judge Frank Haswell assumed jurisdiction in the suit and a hearing was held on March 9, 1964.

From February till April 1964 improvements on the scrubbers in the mixing den were installed. On June 11, 1964, Judge Haswell restrained operations and required improvements both in the mixing den and in the roasting process to retain the emissions. On June 19, 1964, the defendant petitioned the court to reopen, stating that the improvements required by Judge Haswell had been completed except as to a cyclone in the kiln on which delivery could not be obtained.

In July 1964 the 8 foot by 150 foot stack was increased to 200 feet. However, by January 1966 the stack had deteriorated from the corrosive action of the gases so that it had a leak 135 feet from the ground. In July 1964, the defendant began using hydrated lime because it was more efficient as a scrub-

bing agent. In July of 1964 there was agreement between the parties in Judge Haswell's suit to allow the defendant to reopen giving the State Board of Health power to close the defendant's operation. In September of 1964 Judge Haswell was disqualified and Judge Green assumed jurisdiction. On November 6, 1964, the State Board of Health ordered the defendant's operation closed until compliance with Judge Haswell's June 11, 1964, order. On December 15, 1964, Judge Green allowed the plant to run under the direction of the State Board of Health. As stated previously, this action was filed in February 1965. On March 19, 1965, before Judge Green, the defendant's President Rhodes stated to the court that the defendant had changed to a modified soda ash process on March 15, 1965. On April 7, 1965, Judge Green ordered the mixing den and kiln enjoined as of April 12, 1965, until the defendant would eliminate the fluorides.

Just prior to the jury trial on March 21, 1966, on February 14, 1966, the defendant changed over to the full soda ash process and at the same time installed a new wet scrubber system manufactured by Aero-Tech Industries of Greenwich, Connecticut, tested to be 98 percent effective.

At the close of the testimony, plaintiffs Mollenberg, Knop and Gilman moved for a directed verdict against the defendant. The defendant did not resist the motion. The trial court granted the motion and directed the verdict as to these plaintiffs against the defendant as to liability.

We will first discuss the issues presented in defendant's appeal 11205, the damage action. The issues will be summarized and discussed as follows:

(1) The refusal of defendant's instruction and the court's failure to instruct, especially with regard to the contention that two of the plaintiffs were affected by sources of fluoride contamination other than that given off by defendant.

(2) Compensatory damages.

(a) Whether supported by competent evidence.

(b)  Whether damages awarded were based only on speculative or conjectural evidence;

(c)  Whether the amount of damages awarded was excessive; and

(d)  Whether evidence of damage was admitted erroneously.

(3)  Whether the award of $100,000 punitive damages was justified under the law and the facts of the case.

With reference to the failure to instruct and the refusal of defendant's instruction with regard to other sources of contamination, the defendant in his brief does not set out the instruction refused or the reasons given for the refusal; nor is specific argument made in the brief as to a particular instruction offered or refused.

Defendant presented evidence that plaintiff Dutton's cattle were pastured on Broch Creek, also, samples of mud from Broch Creek contained as much as 8,520 parts per million of fluoride. Defendant presented evidence that plaintiff Knop's cattle were pastured on Warm Springs Creek; that samples of mud from Warm Springs Creek contained as much as 940 parts per million of fluoride. Other evidence is in the record which, under one view, might establish under the time tables of the veterinarians, that the teeth of some of Dutton's and one of Knop's cattle could have been marked by the fluorides before August 1963, the date of the beginning of defendant's operation.

In any event, the defendant relies on the Montana case of Watson v. Colusa Parrot Min. & Smelting Co., 31 Mont. 513, 516, 79 P. 14, 15, which states as follows:

"Under the facts disclosed by the record it is apparent that the nuisance complained of as causing the injury for which damages are sought arose from individual acts of different mining and reduction companies operating mines and plants in the City of Butte, whereby they have discharged deleterious and poisonous matter into the waters of Silver Bow Creek,

a tributary of Deer Lodge River; that the nuisance was merely incidental to and the result of such acts; and that the injury was not caused by the joint acts of defendant and any other corporation or person.

"Under the following authorities the defendant was liable to plaintiffs for whatever damage it caused by its own wrongful acts, and none other: [Citing cases].

"Defendant could not be held to respond in damages for the entire injury occasioned to plaintiffs by the nuisance complained of, because confessedly it only contributed to this injury. The full damage, therefore, must be apportioned among all the wrongdoers. The mere fact that it is difficult to determine what part of the damage was occasioned by acts of the defendant is no objection to the relief asked."

The Montana Court in Heckaman v. Northern Pac. Ry. Co., 93 Mont. 363, 20 P.2d 258, cites the Watson case, supra, with approval and explains the application of the rule of apportionment of damages between two independent culpable agents or the responsibility of a culpable defendant for such damages as are directly traceable to his act. However, the court goes on to state at p. 388 of 93 Mont., at p. 266 of 20 P.2d, why the rule did not apply in that particular case:

"If in a given case, it is conceded or shown that damage would have resulted regardless of the existence of an embankment, but additional damage was suffered by reason of the negligent maintenance of the embankment, the plaintiff must produce evidence as to the amount of damage for which the defendant is liable. Fort Worth [& D. C.] Ry. Co. v. Speer, [Tex.Civ.App., 212 S.W. 762].

"However, the case at bar was not tried on the theory of segregable damages. The contention of the plaintiff was that the injury, in its entiretly, was caused by water backed by reason of the insufficiency of the openings in the embankment, while the defendant pleaded and asserted that the damage was caused by a 'veritable wall of water' which swept

down the creek and engulfed the town of Wibaux before it reached the embankment. * * *

"It must be presumed that counsel for the defendant knew of the nature of the testimony their witnesses would give, and, had they intended to rely upon the rule of apportionment of damages, they should have interrogated the plaintiff as to the nature of goods and property which would not have been injured by a foot and a half of water and thus laid their foundation for an instruction on the subject.

"* * * Had the instruction offered been a model on the subject, we think, upon the facts proven, its refusal would not have constituted reversible error * * *."

This quotation applies in this case. Under the theory the case was tried the jury was properly instructed in this regard.

In order to properly comment on the damage feature of the case, it is necessary first to examine the trial court's method of trial of the case. The statement to the jury opening the instructions was as follows:

"The plaintiffs and defendant have agreed that Garrison, Montana, is a rural community situated at the junction of the Little Blackfoot and Clark's Fork River in Powell County, Montana; the lands within an approximate 15 mile radius of Garrison are agricultural in character and suited to the production of grass and hay; these lands are now, and for many years have been devoted to the raising of cattle * * *. In August 1963, the defendant commenced the operation of a plant at Garrison, Montana, the purpose of which was to produce a defluorinated phosphate mineral supplement for use in the feeding of livestock; that the finished product contained .18 percent of fluorine; that the raw phosphate rock used in the process contains 3.3 to 4.2 percent fluorine, and that on the basis of a 40 ton day production, which is defendant's estimated rate of production, it is necessary to release from the raw rock from 2,640 to 3,360 pounds of fluorine per

day; these amounts of fluorine are either captured in the plant or emitted into the air."

The Court then in Instruction 16 to the jury stated:

"If you find from the evidence that the defendant, in the operation of its plant at Garrison, Montana, produced fluorine, that it permitted fluorine to escape, that such fluorine was deposited upon a plaintiff's land and that it damaged a plaintiff's land, or animals or trees, then you are instructed that that plaintiff is entitled to the damage proximately caused by the defendant's act."

The modern law on this subject looks to its beginning in Rylands v. Fletcher, (1866, Eng.) LR 1 Exch. 265, 4 Hurlst & C 263, 1 ERC 236, aff. LR 3 HL 330, 1 ERC. 256.

Lord Blackburn in the intermediate court states at page 271 of LR 1 Exch:

"We think that the true rule of law is, that the person who, for his own purposes brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it in *at his peril,* and if he does not do so, is prima facie answerable for all the damage which is a natural consequence of its escape."

Lord Cairns in affirming Lord Blackburn in LR 3 HL 330, p. 338, in the House of Lords limits the above statement with this comment:

"* * * or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbor who has brought something on his own property (which was not naturally there), harmless to others so long as it is confined to his own property, but which he knows will be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there, no mischief could have

accrued, and it seems but just that he should at his peril keep it there, so that no mischief may accrue, or answer for the natural and anticipated consequence. And upon authority this we think is established to be the law, whether the things so brought be beasts, or water, or filth, or stenches."

Prosser on Torts, 2d.Ed. 1955, p. 329, Chapter 11, Strict Liability, § 59, Abnormal Things and Activities, states as follows:

"The principle has been recognized fully in England, and to a considerable extent in the United States, that one who maintains a condition, or engages in an activity, which involves a high degree of risk of harm to others and is abnormal in the community and inappropriate to its surroundings, is strictly liable for the harm which it causes."

With reference to Rylands v. Fletcher and Lord Cairns' opinion, Prosser states:

"Lord Cairns said that the principle applied only to a 'non-natural' use of the defendant's land, as distinguished from 'any purpose for which it might in the ordinary course of the enjoyment of the land be used.' The emphasis was thus shifted to the abnormal and inappropriate character of the defendant's reservoir in coal mining country, rather than the mere tendency of all water to escape. * * *

"The strict liability has been said many times to be confined to things or activities which are 'extraordinary', 'exceptional', or 'abnormal', and not to apply to the 'usual and normal'. There must be 'some special use bringing with it increased danger to others, and must not merely be the ordinary use of land or such a use as is proper for the general benefit of the community.'

"In determining what is a 'non-natural use' the English courts have looked not only to the character of the thing or activity in question, but also to the place and manner in which it is maintained and its relation to its surroundings. * * *

"The place where all this occurs, the customs of the com-

munity, and the natural fitness or adaptation of the premises for the purpose, all are highly important in determining whether the rule applies."

██ ██ Montana long has followed the general principles enunciated above and Justice Holloway, in Fleming v. Lockwood, 36 Mont. 384, 388, 92 P. 962, sets them out as follows:

"'* * * every one must so use his property as not to injure that of his neighbor.' This principle of law finds expression in the maxim *'Sic utere tuo ut alienum non laedas,'* which our Civil Code, in section 4605, [Now R.C.M.1947, § 49-106] has translated as follows:

"'One must so use his own rights as not to infringe upon the rights of another.' * * *

"This maxim furnishes, in a general sense, the rule by which every member of society possesses and enjoys his property; but it is not an ironclad rule, without limitations. If applied literally in every case, it would largely defeat the very purpose of its existence; for in many instances it would deprive individuals of the legitimate use of their property, and, for all practical purposes, destroy it. Hentz v. Long Island R. R. Co., 13 Barb. 646. The doctrine of the maxim is not inconsistent with the rule of law that a man may use his own property as he pleases, for all purposes for which it is adaptable, without being answerable for the consequences, if he is not an active agent in designedly causing injury, if he does not create a nuisance, or if he exercises due care and caution to prevent such injury. Fisher v. Clark, 41 Barb. 329."

This case was cited with approval in the nuisance case, Purcell v. Davis, 100 Mont. 480, 50 P.2d 255.

The Federal Court for the District of Montana, in a case dealing with this same valley and the smelter at Anaconda in Bliss v. Anaconda Copper Mining Co. (1909 CC Mont.), 167 F. 342, at 369, states:

"We therefore ask: Can both industrial and agricultural welfare be preserved under the exigencies of the whole case

before us? If they may, the court will meet the situation by evolving a rule of conduct whereby both can exist together. The maxim, one must so use his rights as not to infringe upon the rights of another, must be upheld by preserving the absolute right to recover judgment for damages wherever substantial injury is shown."

The annotation entitled: "Landowner's or Occupant's Liability in Damages for Escape, Without Negligence, of Harmful Gases or Fumes From Premises" in 54 A.L.R.2d 764, sets out the collected cases with relation to emissions from different types of industrial uses and, more specifically, the cases with reference to emission of fluoride compounds.

After reviewing the cases and the different theories advanced under which recovery is sustained, including negligence, trespass, trespass on the case, nuisance, or the restatement of tort rule, we feel that Rylands v. Fletcher, supra., properly restricted within the safeguards as set out in Prosser, supra., is the correct rule.

In the agreed statement the defendant operated its plant at Garrison with the primary purpose of releasing fluorine from the phosphate rock. That fluorides either are scrubbed out and captured in the plant or, if not, they are emitted into the atmosphere.

The testimony of all the experts, both for the plaintiff and for the defendant, concede that an epidemic of fluorosis existed at Garrison from August 1963, until the time of the trial, although the extent of the area affected decreased as improvements in the scrubbing process were installed.

The defendant admitted injury in some degree to plaintiffs Mollenberg, Gilmore and Knop.

The veterinary experts all testified to the fact that the animals of each plaintiff as examined showed to some degree fluorine toxicosis, but the defendant's experts differed as to the degree of harm and its effect on the particular animal.

The nature of the fluorine toxicosis with reference to its

effect on the development of permanent teeth resulted in damage to the younger animals born and raised after August 1963.

The local veterinarians who were familiar with the herds involved testified to a lack of fluorine toxicosis, especially the mottling of the teeth prior to August 1963 or when they first examined, with reference to this malady, in December 1963.

Each plaintiff testified with relation to damage to his own herd of cattle. Each plaintiff testified that he kept back his best young heifers as replacement cows for his herd.

The defendant, through its agents, knew that the fluorides would damage livestock; was fully aware of the use made by the plaintiffs of their lands; and was aware of the complaints made to it almost immediately after it began operation at Garrison in August 1963.

Montana has always allowed the owner to testify as to the value of personal property including value of animals. The leading case appears to be Klind v. Valley County Bank of Hinsdale (1924), 69 Mont. 386, 222 P. 439.

See also, Smith v. Armstrong, 118 Mont. 290, 166 P.2d 793, where on a retrial the trial court was ordered to allow such testimony with reference to value of animals. Cited with approval in Harding v. H. F. Johnson, Inc., 126 Mont. 70, 82, 244 P.2d 111.

So, also, with relation to the testimony as to value of land. See Alexander v. State Highway Comm'n, 142 Mont. 93, 381 P.2d 780; Harding v. H. F. Johnson, Inc., supra.

The pure bred breeder Dutton had testimony from other pure bred breeders who valued the cattle one by one. Also, he had actual sales of his pure bred bulls which were sold to a wholesaler who could not sell them as breeding bulls but finally had to sell them for baloney.

The defendant complains about the plaintiff Tavenner's testimony with relation to damage to his animals. It is im-

portant that at the time that Mr. Tavenner testified the experts had already identified the malady as fluorine toxicosis. Mr. Tavenner was the operator of a large ranch upon which his cow inventory was 2,626 cows. Of these there were 349 two-year-olds; 679 three-year-olds; 633 four-year-olds; 423 five-year-olds. The rest classed together as six-year-olds and up totalled 542. Of this number he examined 767. He examined 265 three-year-olds which was 39 percent of the 679 three-year-olds he owned; he examined 171 four-year-olds which was 27 percent of the 633 four-year-olds and he examined 27 five-year-olds and only 8 two-year-olds because there would be no permanent teeth showing at 24 months. He claimed no damages for any two-year-olds but only with respect to three, four, and five-year-olds. He testified that his estimate of damage was based upon animals with damaged teeth. Counsel propounded this question:

"Now, when you say a damaged mouth, just how are you using the term damaged, what does that mean to you, sir? A. Well, it means that the teeth are so bad that they are going to wear out soon and deteriorate and make the animal unfit for grazing in this high country."

The defendant objects to this testimony on the ground that the plaintiff was not an expert. The case law is set out in an annotation, "Admissibility of Opinion Evidence of Lay Witnesses as to Diseases and Physical Condition of Animals," 49 A.L.R.2d 932, which annotation with reference to disease at page 938, states:

"Without violation of the rule against inadmissible opinion evidence, a witness who is not a professional person and has no special qualification in the field of animal diseases may testify as to the appearance, manifest symptoms and obvious condition and reactions of an animal so long as his testimony represents facts and impressions open and available to an observer."

Also, the defendant's expert, Dr. Purvance, had an opportun-

ity to examine any or all of the cattle belonging to Mr. Tavenner. He did proceed to Tavenner's ranch and examined 33 head of Tavenner's cows and found 23 with dental lesions having a grade number 4 or 5 and two cows with bone lesions. Dr. Purvance's testimony indicated that of the 33 cows he examined, two were seven-year-olds which were not included in the examinations by Mr. Tavenner. Thus, of the 31 cows of the class for which damages were being claimed, 23 had serious fluorosis of the teeth which would approximate 74 percent of the cattle examined by Dr. Purvance compared with the much smaller percentage used by Mr. Tavenner in his claim for damages.

■■ No attempt has been made to set out all the testimony and evidence as to liability or as to value or damage. In accordance with our long standing precedents it should be remembered that we will review a verdict founded upon conflicting evidence only for the purpose of determining whether it is supported by competent evidence and is not contrary to law, and not for the purpose of determining the weight of the evidence. Suffice it to say this court has reviewed the testimony together with voluminous exhibits and has reviewed, also, the amount of compensatory damages asked by each plaintiff. Dutton had proof of cattle damage of $97,465.25; hay, $4,040.83; and replacement pasture, $3,347.50. The jury awarded them a total of $40,575.00. Knop's capitulation of damage was $5,000 for land damage and $4,104 on cattle. The jury awarded $6,604. Gilman's capitulation showed proof of cattle, $7,589; hay, $436.00. The jury awarded $8,025.00. Graveley's damage to cattle, $7,090.00, jury awarded him $7,090.00. Brand's capitulation showed damage to cattle, $2,515.00; hay, $2,825.00. The jury awarded $3,515.00. Mollenberg showed $48,593.13 land damage, $2,500.00 hay and $11,974.80 for cattle. The jury awarded a total of $15,974.80. Tavenner livestock damage, $54,525.00 and land damage $122,000.00. The jury awarded $31,500.00.

In addition the jury awarded a blanket $10,000.00 punitive damage award to all the plaintiffs collectively except Mollenberg and the defendant contends that the evidence was insufficient to sustain an award of punitive damage.

The Montana law with relation to the awarding of punitive damages for injury to livestock has recently been discussed in Thompson v. Mattuschek, 134 Mont. 500, 333 P.2d 1022 and Franck v. Hudson, 140 Mont. 480, 373 P.2d 951, and so no further comment is necessary.

We therefore, sustain the damage award as to each plaintiff for compensatory damages and for the award of $10,000 exemplary damages.

Finally we have the question of the permanent injunction. The language of the Federal District Court in the Bliss case cited above is applicable here. Can the defendant and the plaintiffs live together?

The trial judge denied the permanent injunction. We believe under the evidence before the court at that time this decision was correct. The last testimony was that the Aero-Tech scrubber was 98 percent effective and that the plant could not operate without the scrubber operating. This scrubber was installed February 14, 1966. The trial began March 21, 1966.

The trial court as Finding of Fact No. 7 found as follows:

"That originally the defendant's operation required that the raw phosphate rock be treated with sulphuric acid and phosphoric acid which made it impossible for defendant company to treat the smoke and gases given off in the kiln with water sprays: however, in March of 1965, defendant company changed its process by eliminating the use of sulphuric acid and by adopting the use of soda ash. That after the inception of this new process the defendant installed a system of water sprays which treated all of the smoke and gas given off by the kiln before such effluents were released into the smoke stack. Tests of hay samples and other tests taken during the year 1965 indicate that such system of treating the smoke and

gases with water sprays effectively removed approximately 95% of the fluorides given off in the manufacturing process. That since that time, in fact in January of 1966, the defendant company installed a new wet scrubbing system manufactured and installed by Aero-Tech Industries of Greenwich, Connecticut. That the defendant cannot operate its kiln without operating such scrubber; that testimony was given by a chemical engineer employed by the manufacturer of such scrubber which indicated that the newly installed scrubber is removing more than 98% of the fluorides released from the phosphate rock and that the gross amount of fluorides actually emitted into the atmosphere is substantially less than seven pounds per hour when gross production rate is approximately 70 tons per day; that the evidence adduced indicates that the operation of defendant's plant will not result in the emission of quantities of fluoride into the atmosphere that will damage hay or grass raised by the plaintiffs and it will not therefore result in damage to plaintiffs' livestock."

However, as detailed above, Mr. Rhodes is an expert, he knew what the fluorides would do. His testimony seemed to be that when they started in the Garrison area the fluorine toxicosis occurred sooner than he expected it to. Further, it is apparent that Rhodes knew of scrubbers available for installation in this operation which would control the emission of fluorides. The conclusion is inescapable that the defendant was prodded each step of the way by the courts to make the scrubbers effective and efficient.

At the oral argument on the injunction feature of this appeal, it was brought out that the State Board of Health had objected to emissions of fluorides by this defendant very recently.

It is also a fact that the plaintiffs have had the burden of proving after each change in operation of the defendant, that they were still being damaged. We recognize, also

that in such a case many other necessary expenses are not recoverable.

We are here dealing in equity. The statement made in Thisted v. Country Club Tower Corporation, 146 Mont. 87, 94, 405 P.2d 432, and again in Thisted v. Tower Management Corporation, 147 Mont. 1, 15, 409 P.2d 813, is appropriate.

" 'Courts of equity are not bound by castiron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 P. 631, 146 P. 469.' " Fey v. A. A. Oil Corp., 129 Mont. 300, 318, 285 P.2d 578, 587.

This court feels under the law of the case as stated above it would be an idle act to restrain or enjoin the defendant from emitting fluorides or fluorine compounds in toxic quantities into the atmosphere.

As stated above, the trial court under the evidence at that time properly refused the injunction. However, equity demands that the trial court should reopen the injunctive feature of the case and require the defendant to establish that its operation is now within reasonable limits and that its operation will not result in the emission of quantities of fluorides into the atmosphere that will damage hay or grass and it will not, therefore, result in damage to livestock.

To determine the question of the reasonableness of the defendant's operation, the trial court may appoint the State Board of Health or any other inspection agency it desires. The cost of said inspection and report to the court shall be at the expense of the defendant, the Rocky Mountain Phosphate, Inc.

This order does not mean the court is to be saddled with policing the operation of the defendant indefinitely, but merely to find the fact whether the defendant since March 1966, to

the time of the hearing to be had, is operating within safe limits.

If the operation is within safe limits the injunction will be denied. If the operation is not within safe limits as found by the trial court, appropriate action will be taken.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES CASTLES and ADAIR, and THE HONORABLE L. C. GULBRANDSON, District Judge.