OP 19-0085

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 59

BNSF RAILWAY COMPANY,

Petitioner,

v.

THE ASBESTOS CLAIMS COURT
OF THE STATE OF MONTANA,
HONORABLE AMY EDDY, Presiding Judge,

Respondent.

ORIGINAL PROCEEDING:     Petition for Writ of Supervisory Control
District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. AC 17-0694
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

For Petitioner:

Dale Schowengerdt (argued), Crowley Fleck PLLP, Helena Montana

Steven R. Milch, Crowley Fleck PLLP, Billings, Montana

Jim Roberts, Chad Knight, Anthony Nicastro, Nadia Patrick, Knight
Nicastro, LLC, Kansas City, Missouri

For Plaintiffs:

Roger Sullivan (argued) Ethan Welder, Jennifer Jeresek Mariman,
McGarvey, Heberling, Sullivan & Lacy, P.C., Kalispell, Montana

For Amicus Montana Trial Lawyers Association:

Michael D. Cok (argued), Cok Kinzler, PLLP, Bozeman, Montana

Argued and Submitted:  October 30, 2019
Decided:  March 11, 2020

Filed:

_____
                 Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     This matter comes before the Court after we assumed supervisory control over proceedings pending before the Montana Asbestos Claims Court (Asbestos Court) in *In re Asbestos Litigation*, Consolidated Case No. AC-17-0694, as applicable to *Barnes, et. al. v. State of Montana, et. al.*, Cause No. DV-16-111, Montana Nineteenth Judicial District Court, Lincoln County.   We now address on extraordinary review BNSF Railway Company's (BNSF) contention that the Asbestos Court erred in granting partial summary judgment in favor of Plaintiffs on the issues of preemption, strict liability, and non-party affirmative defenses.   We affirm in part, reverse in part, and remand for further proceedings.  We restate the issues as follows:

1. *Did the Asbestos Court err by concluding Plaintiff's claims were not preempted by the Federal Railroad Safety Act or the Hazardous Materials Transportation Act?*

2. *Did the Asbestos Court err by concluding BNSF is strictly liable to the Plaintiffs because it engaged in an abnormally dangerous activity?*

3. *Did the Asbestos Court err by concluding the Restatement (Second) of Torts, § 521 does not shield BNSF from strict liability?*

4. *Did the Asbestos Court err by holding BNSF was not entitled to offer evidence of W.R. Grace's conduct to refute causation?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2     Mineral Carbon and Insulating Company, later Zonolite Company (Zonolite), began mining vermiculite in Libby, Montana, in 1922.  In 1963, W.R. Grace (Grace) acquired the assets of Zonolite, including the mine, which it operated until September of 1990.  Grace mined the vermiculite through open strip mining of Vermiculite Mountain, approximately

3

seven miles outside of Libby. Libby was one of only three places in the world where vermiculite was mined, and Grace's operations in Libby were the largest, producing approximately 80% of the world's vermiculite ore. From the mine, between 500 and 1,000 tons of vermiculite concentrate was produced per day in the 1970s, rising to between 800 and 1,000 tons in the 1980s.

¶3 The ore body Grace mined contained a significant amount of amphibole asbestos, and processing the ore produced and released dust containing fine asbestos fibers into the air. After mining and processing the vermiculite, its concentrate was loaded onto BNSF's railcars for transport. BNSF's tracks run through town, and its railyard is located in downtown Libby.[1]

¶4 In response to concerns regarding possible asbestos exposure in Libby, the EPA began investigating in 2000 and placed the site on the Superfund National Priorities List in 2002. In 2003, it released an Initial Pollution Report which revealed "[a]sbestos contaminated materials were hauled and shipped through the [BNSF] railyard, and spilled into the soil for decades," and that "asbestos . . . is present in soil, raw ore, ore-concentrate and other soil-like materials at various locations in and around the community including the BNSF railyard." Likewise, the report indicated that "analytical results have shown

---

[1] Along with transporting the vermiculite for Grace, BNSF also entered into several contracts with Zonolite, later transferred to Grace, including for the construction and maintenance of spur track; use and occupancy of a loading dock, suspension bridge, and belt conveyor; construction and maintenance of steel pipe; use and occupancy of a loading platform; and use and occupancy of a lumber shed, storehouse and roadway, and parking areas. The cost and maintenance of some of these improvements were sometimes borne by BNSF, and sometimes by Grace, and therefore Grace and BNSF also entered multiple insurance and indemnification agreements. BNSF also helped Grace strategize regarding distribution of the product and geologic sampling.

asbestos levels in soil from 2-5%" in the railyard and that "[b]aseline monitoring along the track conducted by BNSF has found the highest concentrations measured during the sweeping ranges from 7 to 14 f/cc in air. A total of 22 surface soil samples collected along the railroad tracks and its railyard ranged from a trace to less than 1% fibrous amphibole asbestos by weight. In addition, visible unexpanded vermiculite remained at Tracks #1, #2 and #3." These statistics were provided by tests done by BNSF at least a decade after the vermiculite mining operations in Libby had ceased, and after BNSF had attempted to excavate and remediate the property.

¶5    Plaintiffs Tracie Barnes, Kenneth Braaten, as Personal Representative of the Estate of Rhonda R. Braaten, and Gerri Flores have brought claims against several defendants, including BNSF, due to their alleged involvement with the asbestos contamination in Libby. Against BNSF, Plaintiffs claimed negligence and common law strict liability, based on "decades of casting asbestos dust into the Libby community from the industrial level of activities at BNSF facilities." In their complaint, Plaintiffs describe these industrial activities, including the transport of asbestos-containing vermiculite, the spillage of asbestos containing material along BSNF's tracks and in its railyard, and the continued disruption of the built-up spilled asbestos by BNSF's trains and workers.

¶6    In October of 2018, the parties filed cross motions for summary judgment based on the issues of preemption of Plaintiffs' claims, BNSF's strict liability, and the preclusion of BNSF's defense of non-party conduct. The Asbestos Court granted Plaintiffs' motion in part, and in two separate orders concluded that (1) Plaintiffs' claims were not preempted

by federal law, (2) BNSF was strictly liable because its actions were abnormally dangerous, and (3) BNSF could not present evidence of non-party conduct to negate causation. Pursuant to M. R. App. P. 14, BNSF filed a petition for writ of supervisory control, which this Court granted on April 16, 2019. The parties fully briefed the issues, and on the Court's order, presented oral argument on October 30, 2019.

## STANDARD OF REVIEW

¶7 This Court reviews a district court's summary judgment ruling *de novo*, applying the same criteria as the district court. *Beckman v. Butte-Silver Bow Cty.*, 2000 MT 112, ¶ 11, 299 Mont. 389, 1 P.3d 348; *Sprunk v. First Bank Sys.*, 252 Mont. 463, 465-66, 830 P.2d 103, 104 (1992). Summary judgment is only appropriate where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Sprunk*, 252 Mont. at 466, 830 P.2d at 104. Once the party moving for summary judgment meets its burden of establishing an absence of genuine issues of material fact, the opposing party must present substantial evidence to raise a genuine issue of material fact, more than "speculative, fanciful, or conclusory statements." *Sprunk*, 252 Mont. at 466-67, 830 P.2d at 105. "Important in the determination is whether the material facts are actually disputed by the parties or whether the parties simply interpret the facts differently. . . . [m]ere disagreement about the interpretation of a fact or facts does not amount to genuine issues of material fact." *Sprunk*, 252 Mont. at 466, 830 P.2d at 105.

## DISCUSSION

¶8 *1. Did the Asbestos Court err by concluding Plaintiff's claims were not preempted by the Federal Railroad Safety Act or the Hazardous Materials Transportation Act?*

6

¶9	BNSF argues both the Federal Railroad Safety Act (FRSA) and the Hazardous Materials Transportation Act (HMTA) preempt Plaintiffs' claims in this case. Plaintiffs counter that FRSA and HMTA do not preempt their claims based on the plain language of the regulations promulgated under the respective Acts.

¶10	The United States Supreme Court and this Court have "consistently held that preemption is not easily favored." *Reidelbach v. Burlington N. & Santa Fe Ry. Co.*, 2002 MT 289, ¶ 21, 312 Mont. 498, 60 P.3d 418; *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996). Both courts have generally applied a "presumption against preemption." *Reidelbach*, ¶ 21 (citations omitted). Where a statute contains an express preemption clause, courts "do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016) (citing *Chamber of Commerce of the United States of America v. Whiting*, 563 U.S. 582, 594, 131 S. Ct. 1968, 1977 (2011)); *see also CSX Transp. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993). However, even if this Court did not apply the presumption against preemption in this case, we would nonetheless conclude that BNSF has not met its burden to demonstrate FRSA and HMTA preempt Plaintiffs' claims.

¶11	In *CSX Transportation*, the plaintiff's husband was killed when a train owned and operated by CSX Transportation, Inc. (CSX) collided with his truck. Plaintiff alleged CSX was negligent for failing to maintain adequate warning devices at a railroad crossing and

for operating a train at an excessive speed, while CSX contended the claims were preempted by FRSA. *CSX Transp.*, 507 U.S. at 661, 113 S. Ct. at 1736. In determining whether the claims were preempted, the United States Supreme Court examined the plain text of FRSA's express preemption provision, now 49 U.S.C. § 20106, which provided that "the states are permitted to 'adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.'" *CSX Transp.*, 507 U.S. at 662, 113 S. Ct. at 1736 (citing 45 U.S.C. § 421). The Supreme Court found the specific issue with respect to preemption under this statute was "whether the Secretary of Transportation has issued regulations covering the same subject matter as [the the State's] negligence law[.]" *CSX Transp.*, 507 U.S. at 664, 113 S. Ct. at 1738. Thus, to prove a state law claim is preempted under the language of FRSA's preemption provision, a party "must establish more than that [the regulations] 'touch upon' or 'relate to' the subject matter, for 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations *substantially subsume* the subject matter of the relevant state law." *CSX Transp.*, 507 U.S. at 664, 113 S. Ct. at 1738 (internal citations omitted) (emphasis added). In this context, the "subject matter of the relevant state law" is determined by looking at the subject matter of the plaintiff's allegations. *See CSX Transp.*, 507 U.S. at 665, 113 S. Ct. at 1738.

¶12 BNSF cites the same FRSA express preemption provision that was at issue in *CSX Transportation* for its contention that Plaintiffs' claims are preempted. Therefore, like

8

CSX, BNSF has the burden of establishing that FRSA's regulations substantially subsume the subject matter of the allegations of Plaintiffs' claims. We conclude BNSF has not met that burden.

¶13 First, BNSF contends Plaintiffs' claims are preempted under 49 C.F.R. § 213.9, which provides the maximum speed that trains may travel. In support, BNSF points to only one sentence of Plaintiffs' 36-page complaint, which states "[a]n average of 20 non-stop trains consisting of up to 100 cars sped through the Libby Railyard at 50 mph on a given day." In the context of the paragraph from which this sentence is taken,[2] and viewed in the context of Plaintiffs' complaint, the sentence does not state a claim involving state law subject matter that is substantially subsumed by the cited federal regulations. Discussing § 213.9 in *CSX Transportation*, the Supreme Court concluded, "[o]n their face, the provisions . . . address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate." *CSX Transp.*, 507 U.S. at 674, 113 S. Ct. at 1742. Here, BNSF has not established that Plaintiffs' claims are based on the contention BNSF's trains were travelling in excess of the maximum speed permitted by the regulation for the type of track it used in Libby. Although Plaintiffs reference the speed

---

[2] The entirety of the complaint's paragraph provides: "Constant industrial activities took place at the Railyard throughout Plaintiffs' period of exposure, resulting in disturbance of the asbestos containing dirt, dust, and vermiculite ore documented at the site. These railroad activities occurred in close proximity to, or direct contact with, the ubiquitous visible vermiculite at the site, resulting in creation of consistent clouds of visible dust. An average of 20 non-stop trains consisting of up to 100 cars sped through the Libby Railyard at 50 mph on a given day. Asbestos containing dust produced through active disturbance of vermiculite, asbestos contaminated soil and other surfaces would remain suspended for many hours as it drifted throughout the Libby community."

of the trains in the sentence BNSF refers to, they do not contend this speed exceeded an approved maximum speed for the area or the type of track. Thus, because Plaintiffs' claims are not substantially about train speed, the cited regulations can only be said at most to "touch upon" or "relate to" Plaintiffs' broader claims, and have no preemptive effect upon this action. Therefore, applying § 213.9 on its face, BNSF has not met its burden to establish that the regulations substantially subsume Plaintiffs' claims.

¶14 Additionally, even employing a broader review of the "context of the overall structure of the regulations," as the Supreme Court did in *CSX Transportation*, we still conclude Plaintiffs' claims are not based upon state law subject matter substantially subsumed by the federal regulations. *CSX Transp.*, 507 U.S. at 674, 113 S. Ct. at 1742. In *CSX Transportation*, the Supreme Court held that, although the Plaintiffs did not contend CSX's train was travelling over the speed limit, "[u]nderstood in context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner." *CSX Transp.*, 507 U.S. at 674, 113 S. Ct. at 1742. The Supreme Court based this conclusion on the fact that "the safety regulations established by the Secretary concentrate on providing clear and accurate warnings of the approach of oncoming trains to drivers. Accordingly, the Secretary's regulations focus on providing appropriate warnings given variations in train speed." *CSX Transp.*, 507 U.S. at 674, 113 S. Ct. at 1742-43. Here, BNSF has pointed to no contention in Plaintiffs' complaint or other pleadings indicating they are seeking state law relief based on unclear or inaccurate

10

warnings given by BNSF of the approach of their trains to drivers or pedestrians. Therefore, we conclude § 213.9 does not substantially subsume the Plaintiffs' claims.

¶15 Second, BNSF contends the regulations within 49 C.F.R. §§ 215.009-215.203 preempt Plaintiffs' claims premised upon BNSF spilling vermiculite out of its cars, arguing the regulations "address the selection, the inspection, and the repairing of freight cars." BNSF points to a factual allegation in Plaintiffs' complaint that "vermiculite[-]containing amphibole asbestos was released to the environment through spillage from rail cars." BNSF does not specifically identify which regulation it believes preempts Plaintiffs' claims, and we conclude the regulations do not preempt Plaintiffs' state law claims for the same reasons as stated above. The regulations provide the appropriate protocol for addressing defects in railcars, including defective wheels, plain bearing boxes, and roller bearings, and govern when railcars must be inspected for compliance. BNSF does not contend, and Plaintiffs' complaint does not allege, that Plaintiffs' claims are based on a defect in the cars that caused spillage. BNSF has not met its burden to establish that 49 C.F.R. §§ 215.009-215.203 substantially subsume the subject matter of Plaintiffs' state law claims, and therefore, Plaintiffs' claims are not preempted thereby.

¶16 BNSF also alleges that sections of the HMTA preempt Plaintiffs' claims. However, BNSF cannot meet its burden of establishing that Plaintiffs' state law claims are substantially subsumed by the HMTA because, as BNSF concedes, the HMTA does not include ore containing asbestos as a hazardous material. Federal courts in Montana have likewise held that the HMTA "poses no regulatory effect" on such claims "based upon the

11

fact that immersed asbestos does not constitute a hazardous material. No conflict exists with any state law regarding vermiculite and the HMTA." *Deason v. BNSF Ry. Co.*, 2018 U.S. Dist. LEXIS 126178, *6-7 (Dist. Mont. 2018); *Underwood v. BNSF Ry. Co.*, 2018 U.S. Dist. LEXIS 126183, *6-7 (Dist. Mont. 2018); *Murphy-Fauth v. BNSF Ry. Co.*, 2018 U.S. Dist. LEXIS 126180, *6-7 (Dist. Mont. 2018).

¶17     Finally, we disagree with BNSF's preemption argument that the Secretary of Transportation's exclusion of mineral ore asbestos within the HMTA constitutes an authoritative federal determination that the transportation of mineral-bound asbestos is to be unregulated. In *Sprietsma v. Mercury Marine*, 537 U.S. 51, 123 S. Ct. 518 (2002), the plaintiff's wife died after being struck by a boat propeller. Plaintiff brought suit against the boat's manufacturer, arguing that the company manufactured an unreasonably dangerous product because the boat's motor did not have a propeller guard. *Sprietsma*, 537 U.S. at 55, 123 S. Ct. at 522. The defendants argued, among other things, that the Coast Guard's decision *not* to regulate propeller guards had preempted the plaintiff's claims. *Sprietsma*, 537 U.S. at 56, 123 S. Ct. at 523. The Coast Guard's entire explanation for its regulatory decision stated:

> The regulatory process is very structured and stringent regarding justification. Available propeller guard accident data do not support imposition of a regulation requiring propeller guards on motorboats. Regulatory action is also limited by the many questions about whether a universally acceptable propeller guard is available or technically feasible in all modes of boat operation. Additionally, the question of retrofitting millions of boats would certainly be a major economic consideration.

*Sprietsma*, 537 U.S. at 66, 123 S. Ct. at 528 (internal quotations omitted). The United States Supreme Court recognized that "'a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate.'" *Sprietsma*, 537 U.S. at 66, 123 S. Ct. at 528 (citations omitted). Nonetheless, the Supreme Court held the Coast Guard's explanation "[did] not convey an 'authoritative' message of a federal policy against propeller guards" that would preempt the plaintiff's claims. *Sprietsma*, 537 U.S. at 67, 123 S. Ct. at 528. Rather, the Supreme Court concluded the statement "reveal[ed] only a judgment that the available data did not meet the FBSA's 'stringent' criteria for federal regulation." *Sprietsma*, 537 U.S. at 66-67, 123 S. Ct. at 528. The Supreme Court held the language did not preempt plaintiff's claims because it did not demonstrate the Coast Guard "[took] the further step of deciding that, as a matter of policy, the States and their political subdivisions should not impose some version of [the regulation]." *Sprietsma*, 537 U.S. at 67, 123 S. Ct. at 528. The Supreme Court held that, in order to preempt state law by a determination to forego regulation, there must be an indication that this determination "would be inconsistent with a tort verdict" premised on the finding that the unregulated item caused the plaintiff's injury. *Sprietsma*, 537 U.S. at 67, 123 S. Ct. at 528. Preemption by way of a decision *not* to regulate an area of the law must be "meant in an unqualified sense; otherwise, deliberate federal inaction could always imply preemption, which cannot be." *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503, 108 S. Ct. 1350, 1355 (1988).

13

¶18 Here, just as in *Sprietsma*, the agency's comments do not express an intention that Plaintiffs' claims be preempted by a decision to forego regulation. The Secretary's explanation provides:

> In light of the regulatory controls already in existence or under consideration by other federal agencies, *and until such time a*s *the MTB has more specific and concrete information* that the normal packaging and handling of these forms of asbestos is such as to create unreasonable asbestos exposure problems, the MTB does not believe their specific regulation in transportation is warranted.

43 Fed. Reg. 8562-63 (Mar. 2, 1978) (emphasis added). Similar to the Coast Guard's language in *Sprietsma*, this language reveals only a judgment that there was not enough available data at the time the notice was published for the agency to adopt a regulation. Nothing in the notice's plain language indicates the MTB took the further step of deciding, as a matter of policy, that the States and political subdivisions should not regulate the handling and transport of vermiculite ore. Most importantly, the language does not indicate that a jury's finding that BNSF mishandled vermiculite ore would be in conflict with federal law. Therefore, as in *Sprietsma*, there is no "authoritative" message of a federal policy against regulating the handling of vermiculite ore. Thus, we also conclude Plaintiffs claims are not preempted by the HMTA.

¶19 *2. Did the Asbestos Court err by concluding BNSF is strictly liable to the Plaintiffs because it engaged in an abnormally dangerous activity?*

¶20 The Asbestos Court concluded BNSF's activities were abnormally dangerous, applying the multi-factor test in the Restatement (Second) of Torts, § 520. BNSF argues the Asbestos Court erred because there were genuine issues of material fact regarding its

14

responsibility for bringing asbestos into Libby.  Plaintiffs answer there is no genuine dispute of material fact and that BNSF merely disagrees about the interpretation of the evidence, which does not rise to the level of factual dispute required to overcome summary judgment.

¶21    In *Matkovic v. Shell Oil Co.*, 218 Mont. 156, 707 P.2d 2 (1985), this Court adopted Restatement (Second) of Torts §§ 519 and 520.  Section 519 provides that one who carries on an abnormally dangerous activity is subject to strict liability.  This strict liability "is limited to the instances of harm that made the activity or condition abnormally dangerous[.]" *Covey v. Brishka*, 2019 MT 164, ¶ 23, 396 Mont. 362, 445 P.3d 785.  Section 520 defines "abnormally dangerous" in this context, providing that courts should consider the following factors:

(a) Existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) Likelihood that the harm that results from it will be great;
(c) Inability to eliminate the risk by the exercise of  reasonable care;
(d) Extent to which the activity is not a matter of common usage;
(e) Inappropriateness of the activity to the place where it is carried on; and
(f) Extent to which its value to the community is outweighed by its dangerous attributes.

"To make a determination that an activity is abnormally dangerous, all factors need not be present, but a district court must nonetheless consider all the factors."  *Covey*, ¶ 23 (citing *Chambers v. City of Helena*, 2002 MT 142, ¶ 21, 310 Mont. 241, 49 P.3d 587).  We address the factors in turn.

*a. Existence of a high degree of risk of some harm to the person, land, or chattels of others*

15

¶22 The Asbestos Court found this factor "weigh[ed] heavily in favor of finding an abnormally dangerous activity" because "[t]here is no question that through BNSF's activities in Libby there was a high degree of risk of some harm to members of the community exposed to asbestos dust[.]" BNSF contends a genuine issue of material fact exists regarding whether it exposed the community to asbestos, arguing that "virtually no asbestos was present on or around BNSF's tracks, its railyard, or the air surrounding its properties." Plaintiffs assert the record before the Asbestos Court clearly indicated that, more than a decade after the Libby vermiculite activities ceased, BNSF's Libby Railyard still contained vast asbestos contamination. The parties do not dispute that exposure to asbestos creates a high degree of risk of harm to individuals through airborne contamination.

¶23 The evidence BNSF presents does not dispute there were large amounts of asbestos present in its railyard and around its tracks. Central to both parties' arguments is the EPA's 2003 Initial Pollution Report. BNSF correctly points out that the document provides, "[a] total of 22 surface soil samples collected along the railroad tracks and its railyard ranged from a trace to less than 1% fibrous amphibole asbestos by weight." However, reviewing the document in its entirety, it also establishes additional facts BNSF does not dispute, including that the railyard testing revealed asbestos soil levels of 2-5% and extensive areas of visible vermiculite. Therefore, by not actually disputing *the entirety* of the EPA's report, including the several statements that ample asbestos remained in the Libby Railyard, BNSF did not meet its burden to defeat summary judgment. Similarly, BNSF references one part

16

of a 2001 EPA report on personal air samples, and points out that those results do not exceed the OSHA limit. However, upon examining the entirety of the test results in that report, it is clear that plenty of the samples taken did exceed the OSHA limit. Likewise, the EPA's 2003 Initial Pollution Report indicates airborne asbestos levels at 7-14 f/cc, far above the OSHA limit. Again, BNSF does not dispute these numbers. Finally, BNSF's expert, relying on maps that indicate asbestos was present in the soil around BNSF's property, maintained only that the asbestos in the soil "is not *clustered* around the BNSF rail yard or the BNSF tracks," but that, nonetheless, "detections of [asbestos] are widespread throughout the area . . . ." (Emphasis added.) Thus, although BNSF cherry picks the record to cite to isolated favorable test results, it is beyond dispute that extensive asbestos existed, at high levels, on BNSF's properties.

¶24 Additionally, several of BNSF's citations to evidence that it argues disputes the assertion it brought asbestos into Libby are not supported by the record. For example, BNSF contends that "[s]tudies of vermiculite concentrate employing transmission electron microscopy . . . found only trace amounts of asbestos fibers" of less than 0.1%, citing to a paragraph in Plaintiffs' expert's report. However, that paragraph plainly does not report the levels of contamination that BNSF proffers, but rather provides, "[o]utdoor asbestos air concentrations were measured at locations near the downtown BNSF Railyard in 1975 at up to 1.5 f/cc, more than 16,000 times higher than the LA RfC." Similarly, BNSF contends that virtually no asbestos was present in its railyard, and cites to its own Statement of

17

Disputed Facts that there was no visible vermiculite throughout the railbeds. However, the attached maps show plain markings for "visible biotite" on all of BNSF's tracks.[3]

¶25    Therefore, we conclude the Asbestos Court correctly determined BNSF did not meet its burden of disputing Plaintiff's assertions. Because it is undisputed that BNSF's properties in Libby contained extensive asbestos contamination, and exposure to asbestos creates a great risk of harm to individuals, the Asbestos Court did not err in concluding this factor weighs in favor of finding BNSF strictly liable.

*b. Likelihood that the harm that results from it will be great*

¶26    Here, the Parties made the same arguments they articulated under factor (a). Likewise, the Asbestos Court again found this factor weighed heavily in favor of imposing strict liability, noting BNSF's "actual knowledge of the consequences of asbestos dust exposure, stemming from both concentration of exposure and duration, and . . . that asbestos dust exposure could cause latent diseases." Therefore, our analysis under factor (a) also applies to factor (b) in this case, and the Asbestos Court did not err in finding this factor weighed in favor of holding BNSF strictly liable.

*c. Inability to eliminate the risk by the exercise of reasonable care*

---

[3] As support for several of its central contentions, BNSF cites to its Statement of Disputed Facts and Supplemental Statement of Disputed Facts, which in turn cite to several different individual exhibits, some of which were not provided to the Court in BNSF's appendix, despite this Court's order noting deficiencies in the appendix and requesting supplementation. For example, BNSF's support for the statement that there was "virtually no asbestos" in the railyard cited to 19 different paragraphs of its Supplemental Statement of Disputed Facts, and those statements cited to eleven different exhibits, some of which were not provided in BNSF's revised appendix.

¶27 Plaintiffs argue the Asbestos Court correctly concluded this factor weighed in favor of applying strict liability because it found "a prudent safety program could [not] conceivably have mandated community-wide use of qualified respirators or showers and a change of clothes for anyone and everyone randomly exposed to BNSF's asbestos dust[.]" BNSF contends the Asbestos Court's analysis was improper and that the risk of transporting asbestos can be reasonably limited.

¶28 Comment h to § 520 explains, "[i]t is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all reasonable care, in his operation, so that he is not negligent." Further, Comment h explains that "when safety cannot be attained by the exercise of due care" the danger becomes "abnormal."

¶29 Consequently, both parties offer incorrect arguments about the question the Asbestos Court should have analyzed here. BNSF argues the proper analysis is whether a person who transports or handles asbestos can make the *dangers* associated with those actions "reasonable." However, as Comment h explains, the question is not whether the danger can be "reduced to reasonable," but whether the exercise of reasonable care can eliminate the abnormal danger in the object. The Plaintiffs' analysis relies on the contention that safety for each citizen of Libby would not be "conceivable," but Comment h expressly rejects this type of analysis.

¶30    Even setting aside its analytical error, BNSF presents no more than a conclusory statement that "there is no evidence that reasonable care in the packaging of vermiculite concentrate cannot reduce any risks to reasonable levels, particularly in light of the evidence showing no harmful contamination emanating from BNSF's activities and property." Further, the authority BNSF cites to establish that asbestos can be made reasonably safe is distinguishable. *See Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I. 1996) (the court expressly limited its holding to the facts of that case where the defendant was tasked with the "limited activit[y]" of inspecting buildings for asbestos prior to demolition); *PSI Energy Inc. v. Roberts*, 829 N.E.2d 943, 954-55 (Ind. 2005) (determining if asbestos is "intrinsically dangerous" in the context of employer-independent contractor liability, not if there was abnormal danger under the § 520 factors); *Tatera v. FMC Corp.*, 786 N.W.2d 810 (Wis. 2010) (finding only that the risk of asbestos exposure can be limited in the *workplace* by wearing protective equipment); *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 695 (Iowa 2009) (likewise, focusing on limiting the risk of asbestos exposure in the workplace). Therefore, this factor weighs in favor of finding BNSF strictly liable.

### d. Extent to which the activity is not a matter of common usage

¶31    BNSF argues that transporting asbestos should be considered common usage because it is common in the industry. Plaintiffs answer BNSF's activities, including transporting vermiculite, are not common usage as defined by the Restatement. The Asbestos Court concluded this factor "tilt[ed] in favor of finding an abnormally dangerous

activity" because "[w]hile the transportation of vermiculate to market was a matter of common usage, BNSF's other activities were not."

¶32    Although Comment i to § 520 provides that activities of common usage are typically carried on by "the great mass of mankind or by many people," several jurisdictions have found that industrial activities such as transporting asbestos can be common usage if they are customary throughout the country or if the services they provide are widely used in the community. *See, e.g.*, *Apodaca v. AAA Gas Co.*, 73 P.3d 215, 227 (N.M. Ct. App. 2003) (citing *New Meadows Holding Co. v. Wash. Water Power Co.*, 687 P.2d 212, 216 (Wash. 1984) (holding the underground transmission of gas is a matter of common usage because approximately 160 million people use gas for residential needs); *Johnson & Johnson v. First Nat'l Bank*, 594 S.W.2d 870, 872 (Ark. Ct. App. 1980) (finding that, although the gas at issue was uncommon, it is "more important" to the consideration of whether it is common usage that "it be uncommon for industrial operations to store and use potentially dangerous gases in pipes in factories in industrial areas."); *First Nat'l Bank in Albuquerque v. Nor-Am Agric. Prods.*, 537 P.2d 682, 687 (N.M. 1975) (finding grain treatment was "common usage" because it "had wide acceptance and use throughout the country" at the time of the incident); *Arlington Forest Assoc. v. Exxon Corp.*, 774 F. Supp. 387, 391 (Va. E. Dist. Ct. 1991) (holding that although Comment i requires the activity to be carried on by the great mass of mankind, removing gasoline from a commercial underground storage tank is nonetheless common usage because such tanks are widely present throughout communities in the country, specifically in close proximity to residential areas). This Court

21

finds the reasoning of these jurisdictions persuasive. Similar to the above referenced cases, BNSF's activity of transporting vermiculite was a common activity in the railroad industry, particularly during the time period at issue here. Likewise, the Libby mine provided vermiculite products to a wide range of individuals across the country, making the activity "common usage" under the rule adopted by the above jurisdictions. Therefore, this factor weighs in favor of finding that BNSF was not engaged in an abnormally dangerous activity.

***e. Inappropriateness of the activity to the place where it is carried on***

¶33 As to this factor, BNSF contends the areas where it carried on its activities were appropriate because "BNSF conducted its operations on railroad tracks and in a railroad yard." Plaintiffs rely on *Dutton v. Rocky Mountain Phosphates*, 151 Mont. 54, 438 P.2d 674 (1968), for their argument that the area where BNSF carried on its activities was inappropriate. The Asbestos Court determined that this factor tilted in favor of finding an abnormally dangerous activity because "BNSF's activities were conducted in a dense urban/residential neighborhood where numerous community members risked exposure by visiting the baseball fields, going to the hospital, shopping downtown, or simply being at home."

¶34 Although BNSF is correct that a railroad must operate in a railyard and on railroad tracks, those facts alone do not establish that the place it carried on the activity of transporting *asbestos* was appropriate. As Comment g to § 520 states, some activities may be abnormally dangerous "only because of the place they are carried on." For example, "[b]lasting, even with powerful high explosives, is not abnormally dangerous if it is done

22

on an uninhabited mountainside, so far from anything of considerable value likely to be harmed that the risk if it does exist is not a serious one. On the other hand, the same magazine of explosives . . . become[s] abnormally dangerous if [it is] carried on in the midst of a city." Restatement (Second) of Torts, § 520, Comment j. Therefore, BNSF's argument that its actions were not abnormally dangerous because they were conducted on railroads and in railyards misses the point of this factor by failing to mention where the railroad and railyard were located. Indeed, it is especially relevant that BNSF's railyard was located in downtown Libby and its tracks ran through the town, where Plaintiffs, as citizens of Libby, are claiming they were injured by exposure to asbestos while conducting their daily activities.

¶35    Additionally, BNSF's argument that its activities took place only on a railway and in a railyard does not necessarily also infer that these locations were appropriate. This Court's adoption of §§ 519 and 520 was premised on the rule it previously adopted in *Dutton*. *Matkovic*, 218 Mont. at 159, 707 P.2d at 4. In *Dutton*, the Court held the district court did not err by instructing the jury that if it found the defendant has produced a colorless, odorless, tasteless gas on the defendant's property which made its way onto plaintiff's land, the jury must find the plaintiffs were entitled to damages. *Dutton*, 151 Mont. 54, 438 P.2d 674. In reaching this conclusion, the Court relied on *Rylands v. Fletcher*, LR 1 Exch. 265 (1866, Eng.) for the proposition that "the person who . . . brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and if he does not do so, is prima facie answerable for all the damage

23

which is a natural consequence of its escape." *Dutton*, 151 Mont. at 65, 438 P.2d at 680. As in *Dutton*, BNSF brought a dangerous material on its property that escaped onto the property of others. Therefore, like the defendants in *Dutton*, BNSF is responsible for the effects of any harmful chemical that Plaintiffs prove escaped its property, even though all of BNSF's activities took place on its own property.

¶36 Therefore, the Asbestos Court did not err by concluding that factor (d) weighed in favor of finding that BNSF's handling of asbestos was abnormally dangerous.

*f. Extent to which its value to the community is outweighed by its dangerous attributes*

¶37 The Asbestos Court found "[t]he tragic history, consequences and enormous cost of asbestos related disease in Libby is well known . . . this factor also weighs heavily in favor of finding an abnormally dangerous activity." BNSF argues that the Asbestos Court's analysis is insufficient, citing *Chambers v. City of Helena*, 2002 MT 142, 310 Mont. 241, 49 P.3d 587, and additionally, that a genuine dispute of material fact exists regarding whether BNSF's conduct is linked to asbestos exposure in Libby, referencing its arguments under factors (a) and (b).

¶38 We conclude the Asbestos Court's analysis was not deficient as BNSF suggests. In *Chambers*, this Court held the district court underwent an incomplete analysis because it did not specifically discuss each of the Restatement factors. *Chambers*, ¶¶ 21-22. This Court did not require that each factor be given extensive analysis. In contrast to *Chambers*, the Asbestos Court did undergo a specific analysis of each of the factors, including (f). And, given our rejection herein of BNSF's arguments under factors (a) and (b), we cannot

24

conclude the Asbestos Court engaged in an improper or incomplete analysis. Therefore, the Asbestos Court did not err in concluding this factor weighed heavily in favor of imposing strict liability. Again, "[t]o make a determination that an activity is abnormally dangerous, all factors need not be present." *Covey*, ¶ 23 (citing *Chambers*, ¶ 21).

¶39 Based on the above discussion, we conclude BNSF's handling of asbestos under the facts presented here constitutes an abnormally dangerous activity for which BNSF is strictly liable under Restatement (Second) of Torts, § 519.

¶40 *3. Did the Asbestos Court err by concluding the Restatement (Second) of Torts, § 521 does not shield BNSF from strict liability?*

¶41 Restatement (Second) of Torts, § 521, provides, "the rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier." Therefore, under § 521, an actor is not strictly liable for the activities it engages in pursuant to its duty as a public officer or employee, or a common carrier. Although this Court adopted §§ 519 and 520 in *Matkovic*, we have not yet adopted § 521.

¶42 The parties present two sub-issues regarding the common carrier exception: first, whether this Court should adopt the exception, and second, whether the exception applies to BNSF in this case. In arguing that § 521 should be adopted, BNSF notes § 519 of the Restatement, which this Court previously adopted, explains that it (§ 519) should be read in conjunction with § 521. BNSF also argues that public policy and precedent suggest this Court should adopt the common carrier exception. Plaintiffs respond this Court's precedent requires rejection of § 521, but argue under the second sub-issue that, even if

25

this Court chooses to adopt § 521, the Asbestos Court did not err by concluding the Section would not shield BNSF from liability, because "BNSF undertook extensive additional activities in furtherance of the vermiculite operations not required of a common carrier which contributed to the asbestos contamination."

*Adoption of § 521*

¶43    Comment a to § 519, which this Court has adopted, provides, "[t]he general rule in this Section is subject to exceptions and qualifications, too numerous to be included within a single Section. It should therefore be read together with §§ 520 to 524A, by which it is limited." Consequently, a majority of jurisdictions that have adopted §§ 519 and 520 have also adopted § 521's common carrier exception. *See, e.g., In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1005-06 (9th Cir. 2008) (holding that Washington State would likely adopt the doctrine and noting that the "vast majority" of jurisdictions have adopted the subsequent exceptions to § 519); *Pecan Shoppe of Springfield, Inc. v. Tri-State Motor Transit Co.*, 573 S.W.2d 431, 435 (Mo. Ct. App. 1978) (adopting and characterizing § 521 as the majority view); *East Troy v. Soo L. R.R. Co.*, 409 F. Supp. 326 (E. D. Wis. 1976); *Christ Church Parish v. Cadet Chem. Corp.*, 199 A.2d 707, 708 (Conn. Super. Ct. 1964); *Albig v. Mun. Auth. of Westmoreland Cty.*, 502 A.2d 658, 664 (Pa. Super. 1985); *Ruiz v. S. Pac. Transp. Co.*, 638 P.2d 406, 412 (N.M. Ct. App.1981); *Pope v. Edward M. Rude Carrier Corp.*, 75 S.E.2d 584, 595-96 (W. Va. 1953); *Peneschi v. Nat'l Steel Corp.*, 295 S.E.2d 1, 27 (W. Va. 1982); *Cairl v. St. Paul*, 268 N.W.2d 908, 911 (Minn. 1978); *Voelker v. Delmarva Power & Light Co.*, 727 F. Supp. 991, 994 (D. Md. 1989). Generally,

26

these courts reason the exception is appropriate because it would be unjust to subject a common carrier to strict liability for any danger done by a material the carrier is required to transport by law. *Pecan Shoppe of Springfield, Inc.*, 573 S.W.2d at 435 (quoting *Pope*, 75 S.E.2d at 595).

¶44 Montana's state district courts have applied the common carrier exception. The courts have reasoned that the materials transported by railroads "are commonly and widely used throughout the nation for the general good of the public, and thus, transportation of such materials is a necessary part of modern society." *Walsh v. Mont. Rail Link*, 2001 Mont. Dist. LEXIS 3033, **22; *Griffin v. Mont. Rail Link*, 2000 Mont. Dist. LEXIS 1331, **5-6; *See also Anderson v. BNSF Railway Co.*, 2010 Mont. Dist. LEXIS 73, *3-4.

¶45 Although the Asbestos Court correctly noted that this Court generally does not support complete immunity, *Wine v. Northern Pac. Ry.*, 48 Mont. 200, 204-06, 136 P. 387, 388-89 (1913), adopting § 521 does not run counter to this precedent. *Wine* is distinguishable from the case at bar because the railroad in *Wine* sought to be shielded from all liability for general negligence as a common carrier. Here, the liability issue concerns whether BNSF will be subject to *strict* liability, and if so, whether that should be limited to the activities it engaged in pursuant to applicable statutes. Indeed, the Montana district courts applying § 521 have identified this important difference, noting that the exception allows a balance between the need to transport certain materials and the need for such transportation to be safe, because even when the exception applies, plaintiffs are still able to allege and pursue general negligence claims against defendants. *Walsh*, 2001 Mont.

27

Dist. LEXIS 3033, **22; *Griffin*, 2000 Mont. Dist. LEXIS 1331, **5-6. Other jurisdictions applying § 521 have held the same. *Peneshi*, 295 S.E.2d at 10 (noting the common carrier exception "does not grant total immunity, but, rather, liability still arises if negligence is proven.") Consequently, because adopting § 521 would not provide complete immunity for BNSF or other common carriers, its adoption does not conflict with our precedent.

¶46 Based on the reasoning provided by the Restatement, the majority of other jurisdictions, and Montana's district courts, we agree with BNSF that this Court should adopt the Restatement (Second) of Torts, § 521, to the extent that it provides, "[t]he rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed on the actor . . . as a common carrier."

*Application of § 521 to BNSF in this case*

¶47 The common carrier exception applies if (1) the activity is carried on in pursuance of a public duty and (2) that public duty is imposed on the actor as a common carrier. Restatement (Second) of Torts, § 521. Here, BNSF can satisfy prong (1) with regard to its actions of transporting vermiculite because state and federal statutes require BNSF to carry any good offered that can be shipped. Section 69-11-403, MCA ("A common carrier shall, if able to do so, accept and carry whatever is offered to the carrier[.]"); 49 U.S.C. § 11101(a) ("A rail carrier . . . shall provide the transportation or service on reasonable request."). These statutory mandates satisfy the duty imposed requirement for purposes of § 521. *E.g.*, *Hanford Nuclear Reservation Litig.*, 534 F.3d at 1006. Likewise, BNSF is a "common carrier" for purposes of prong (2) of § 521; railroads have universally been

28

considered by courts as common carriers entitled to the exception. *See, e.g.,* *Actiesselskabet Ingrid v. Central R. Co.*, 216 F. 72, 78 (2d Cir. 1914). Therefore, BNSF is entitled to the common carrier exception for strict liability imposed as a result of its transporting of vermiculite, which it was required to do by law.

¶48 However, to repeat, § 521 shields qualifying actors only from strict liability. In other words, even if a common carrier engages in activity pursuant to a public duty, it remains subject to liability arising out of its ordinary negligence. Section 521 does not shield the carrier from that liability. Therefore, in this case, to the extent the Asbestos Court finds that BNSF's actions as a common carrier were undertaken pursuant to its public duty, BNSF is shielded from strict liability for such actions. However, BNSF may still be found liable under a theory of ordinary negligence for the manner in which it conducted the transport of the vermiculite ore.

¶49 Further, any other activity BNSF engaged in that was not undertaken pursuant to its statutory duty, but alleged to have caused injuries to Plaintiffs, is not protected from strict liability under § 521. As explained, the Restatement applies the exception only to actions taken pursuant to a public duty. Other jurisdictions have held the exception is so limited in this way. "[T]he courts that have applied the public duty exception have generally done so *only to the extent that a defendant was legally required to perform the ultrahazardous activity*." *Hanford Nuclear Reservation Litig.*, 534 F.3d at 1006 (emphasis added). U.S. District Court Judge Morris referenced the *Hanford Nuclear Reservation Litig.* limitation in *Murphy-Fauth*, reasoning that even if Montana adopted § 521, it would be limited "to

29

actors operating in pursuance of a public duty imposed on it as a common carrier." He further explained that, "Plaintiff alleges numerous activities which BNSF voluntarily undertook for its own purposes. The exception does not apply when an entity engages in abnormally dangerous activity for 'its own purposes.'" *Murphy-Fauth*, 2018 U.S. Dist. LEXIS 126180 at *6 (citation omitted). Thus, BNSF's activities other than transportation of vermiculite are not protected by the common carrier exception. What those "other activities" may be is not an issue now before this Court, and the Asbestos Court on remand may determine which, if any, of BNSF's "other activities" were not undertaken pursuant to its statutory duty.

¶50    *4. Did the Asbestos Court err by holding BNSF was not entitled to offer evidence of W.R. Grace's conduct to refute causation?*

### Section 27-1-703, MCA

¶51    BNSF argues Grace is a "settled party" under § 27-1-703(6), MCA, and therefore, BNSF should be able to use evidence of Grace's conduct to defend against Plaintiffs' claims. Alternatively, BNSF contends this Court cannot reach a decision on the merits of this issue because the issue is not yet ripe. Plaintiffs respond that Grace is not a settled party under § 27-1-703(6), MCA, and, therefore, BNSF cannot use evidence of Grace's conduct to defend against Plaintiffs' claims.

¶52    Section 27-1-703(6), MCA, provides, "[i]n an action based on negligence, a defendant may assert as a defense that the damages of claimant were caused in full or in part by a person with whom the claimant has settled or whom the claimant has released from liability." The statute does not include a definition of "settled." In *Madill v. State*

30

*Compensation Ins. Fund*, 280 Mont. 450, 460, 930 P.2d 665, 671 (1997), this Court used

the Black's Law Dictionary 1372 (6th ed. 1990), definition of "settled":

> Act or process of adjusting or determining; an adjusting; an adjustment between persons concerning their dealings or difficulties; an agreement by which parties having disputed matters between them reach or ascertain what is coming from one to the other; arrangement of difficulties; composure of doubts or differences; determination by agreement; and liquidation. In legal parlance, implies *meeting of the minds of parties* to transaction or controversy.

(Emphasis added.)  Based on this definition, this Court reasoned the parties in *Madill* had

settled because "[t]hey resolved their dispute regarding the amount of benefits to which

Madill was entitled . . . they resolved their dispute about the nature and duration of Madill's

disability; and they resolved their dispute about whether Madill was entitled to lump sum

advance without final settlement of his claim, and whether the benefits being converted to

a lump sum should be reduced to present value." *Madill*, 280 Mont. at 460, 930 P.2d at

671.

¶53    Unlike the parties in *Madill*, Grace and the Plaintiffs have not settled.  Although a

fund has been established to provide for those injured by Grace's activities, as discussed at

oral argument, none of the Plaintiffs have yet received a settlement from that fund.

Although a settlement "does not require a resolution of all rights between two parties[,]" it

does require a meeting of the minds as to the transaction or controversy.  *Madill*, 280 Mont.

at 459-60, 930 P.2d at 671.  There is no evidence in the record to indicate there has been a

meeting of the minds between Grace and the Plaintiffs.  Unlike *Madill*, neither party here

has presented evidence that the Plaintiffs have reached any agreement with Grace regarding

31

how much they might be entitled to, the nature and duration of their illnesses, or the form of settlement they are entitled to. Therefore, Grace has not yet "settled" with Plaintiffs, and is not a settled party for purposes of § 27-1-703, MCA.

¶54 "[T]he judicial power of Montana's courts is limited to 'justiciable controversies.'" *Reichert v. State*, 2012 MT 111, ¶ 53, 365 Mont. 92, 278 P.3d 455 (citing *Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567.) To be a justiciable controversy, a case must be ripe, meaning it must present an actual, present controversy. *Reichert*, ¶ 54 (citing *Mont. Power Co. v. Mont. Pub. Sev. Comm'n.*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91). "The basic purpose of the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Reichert*, ¶ 54 (citing *Mont. Power Co.*, ¶ 32). Thus, "[r]ipeness is predicated on the central perception that courts should not render decisions absent a genuine need to resolve a real dispute; hence, cases are unripe when the parties only point to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Reichert*, ¶ 54 (citing *Wis. C. Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008).

¶55 Where Grace is not yet a settled party, the issue of whether BNSF complied with the procedural requirements in § 72-1-703(6), MCA, and therefore can use Grace's conduct as a defense against Plaintiffs' claims, is unripe. There is not yet a real dispute for this Court to decide because Grace has not settled with Plaintiffs, and therefore, this Court does not have the judicial power to decide this issue at this time.

32

*Evidence of Grace's conduct to apportion causation*

¶56    BNSF argues the Asbestos Court erred in concluding it may not introduce evidence of Grace's conduct in order to defeat causation, relying on *Busta v. Columbus Hosp.*, 276 Mont. 342, 916 P.2d 122 (1996).   Plaintiffs contend, under this Court's well-settled precedent, BNSF may not argue that Grace, a non-party, is responsible for causing Plaintiffs' injuries.

¶57    As an initial matter, *Busta* is distinguishable from the case at bar.   In *Busta*, in reviewing this Court's approach to foreseeability in terms of causation and duty, we noted that "[i]n those cases where there are allegations that more than one person combined to produce a result (*e.g., when the plaintiff alleges negligence and the defendant alleges contributory negligence, or when there are multiple defendants*) . . . we recommend continued use of the substantial factor instruction[.]" *Busta*, 276 Mont. at 371, 916 P.2d at 139 (emphasis added).   However, Grace is not a defendant here, and, therefore, a "multiple defendant" situation is not presented.   Thus, the rule in *Busta* does not apply.

¶58    In *Faulconbridge v. State*, 2006 MT 198, 333 Mont. 186, 142 P.3d 777, the State sought to introduce evidence of a non-party's conduct "to negate causation." *Faulconbridge*, ¶ 73.   The Court concluded that "a defendant may introduce non-party conduct only for the purpose of demonstrating that the non-party conduct was a superseding intervening cause of plaintiff's damages." *Faulconbridge*, ¶ 81.   Likewise, introducing such non-party conduct "in an attempt to merely diminish [a defendant's] own

responsibility" is likewise not allowed "for this would constitute an attempt to apportion fault to a non-party . . . ." *Faulconbridge*, ¶ 81.

¶59 Therefore, BNSF may not introduce evidence of Grace's conduct to refute causation by alleging Grace was a substantial factor in causing Plaintiffs' injuries because BNSF may only use evidence of Grace's conduct as a nonparty for the purpose of proving Grace's conduct was a superseding intervening cause of Plaintiffs' damages.[4]

***Superseding intervening cause***

¶60 BNSF argues there exists a genuine issue of material fact regarding whether Grace's conduct constitutes a superseding intervening cause because Grace's actions continued after the time Plaintiffs allege they were injured by BNSF. Plaintiffs counter that BNSF's storage, loading, and transportation of Grace's vermiculite occurred primarily at the same time as Grace's vermiculite mining operations.

¶61 "A 'superseding intervening cause' is an unforeseeable event that *occurs after a defendant's negligent act* and will generally serve to cut off a defendant's liability." *Covey,* ¶ 60 (quoting *Faulconbridge*, ¶ 81) (emphasis added). In contrast, "foreseeable actions do not break the chain of causation." *Covey*, ¶ 60 (citing *Faulconbridge*, ¶ 85). Finally, a district court may award summary judgment on issues of superseding and intervening

---

[4] We are not faced here with the evidentiary trial issue of refuting the amount of damages attributed to a defendant's sole causation of injuries. *See., i.e., Clark v. Bell*, 2009 MT 390, ¶¶ 23-25, 353 Mont. 331, 220 P.3d 650. Likewise, our holding is not intended to impose a blanket prohibition on *any* mention of Grace in the trial court proceedings. Rather, the Asbestos Court will need to set the evidentiary parameters for BNSF's discussion of Grace's activities necessary for its defense that does not violate the causation holdings herein.

causes "when reasonable minds can reach but one conclusion." *Larchick v. Diocese of Great Falls-Billings*, 2009 MT 175, ¶ 48, 350 Mont. 538, 208 P.3d 836).

¶62 Grace's actions here do not constitute a superseding intervening cause. The record indicates BNSF operated in Libby beginning in the 1920s and continuing until 1994, while Grace purchased the Zonolite vermiculite mine and mill in 1963 and continued its operations until 1990. The undisputed EPA report indicates that the asbestos to which Plaintiffs' claim they were exposed was present on BNSF's property into the 2000s, even after BNSF's formal operations in Libby ended. These facts alone demonstrate the Asbestos Court did not err in concluding that reasonable minds could reach but one conclusion regarding whether Grace's activities were a superseding intervening cause, because Grace's actions were continuous throughout the period, not occurring afterwards. BNSF's argument that "Grace's negligence occurred after the time that Plaintiffs allege they were harmed by BNSF," because Plaintiffs alleged exposure periods in the 1940s, 50s, 60s, and 1978, and Grace's activities continued into the 1990s, is flawed. This argument ignores the fact that, during these alleged years of exposure to which BNSF seeks to confine Plaintiffs' claims, BNSF and Grace were acting contemporaneously on activities that allegedly caused Plaintiffs' injuries. Therefore, the Asbestos Court did not err in finding that Grace's actions were not a superseding intervening cause with regards to BNSF's liability here, and BNSF cannot use evidence of Grace's conduct to refute causation under *Faulconbridge*.

**CONCLUSION**

¶63 Plaintiff's claims are not preempted by either the FRSA or the HMTA. BNSF is subject to strict liability because its actions in handling the asbestos constitute an abnormally dangerous activity. However, it is protected from strict liability under Restatement (Second) of Torts, § 521, for its actions determined to be taken pursuant to its statutory public duty, and for those actions it is subject only to claims for ordinary negligence. Finally, BNSF may not refute causation by offering Grace's conduct as a substantial factor or as a superseding intervening cause of the Plaintiffs' injuries.

¶64 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

36